BERKAW v. MAYFLOWER CONGREGATIONAL CHURCH.

### OPINION OF THE COURT.

**1. JUDGMENT—ESTOPPEL—ISSUES OF FACT—RELIGIOUS SOCIETIES.**

Action for declaration of rights and injunctions, instituted by faithful minority of a Congregational church who opposed union with the Evangelical and Reformed Church to form the United Church of Christ *held*, improperly dismissed on defendant church's motion because previous decisions in class actions were held to estop plaintiffs, since plaintiffs are not estopped from litigating issues raised in their complaint as to whether or not there would be a departure from congregationalism if the defendant church joined the United Church of Christ, an issue not having been passed upon in the class actions.

**2. RELIGIOUS SOCIETIES — COURTS — JURISDICTION — ECCLESIASTICAL QUESTIONS—PROPERTY RIGHTS.**

A civil court has no jurisdiction over ecclesiastical questions unless property rights are involved.

**3. JUDGMENT—COLLATERAL ESTOPPEL—FACT QUESTIONS.**

A judgment on one cause of action is not conclusive in a subsequent action on a different cause of action as to questions of fact not actually litigated and determined in the first action.

### SEPARATE OPINION.
### BLACK, J.

**4. APPEAL AND ERROR—CHANCERY CASES—RECORD.**

*Suits at chancery should be so tried in the lower court that when appealed, the Supreme Court may finally dispose of the issue raised by the pleadings.*

---

### REFERENCES FOR POINTS IN HEADNOTES
[1] 30A Am Jur, Judgments § 405.
[2] 45 Am Jur, Religious Societies §§ 44, 67.
[3] 30A Am Jur, Judgments § 371 *et seq.*
[4] 5 Am Jur 2d, Appeal and Error §§ 822, 967.

Appeal from Court of Appeals, Division 1, J. H. Gillis, P. J., Watts and McGregor, JJ., affirming Wayne; Culehan (Miles N.), J. Submitted February 10, 1966. (Calendar No. 8, Docket No. 51,283.) Decided August 24, 1966. Certiorari denied by Supreme Court of the United States January 23, 1967.

1 Mich App 252, reversed.

Complaint by Helen Joan Berkaw and others against the Mayflower Congregational Church, a Michigan corporation, to enjoin defendant's participation in the merger of the Congregational Christian Churches of the United States with the Evangelical and Reformed Church. Summary judgment for defendant. Plaintiffs appealed. Judgment affirmed by Court of Appeals. Plaintiffs appeal. Reversed and remanded. Judgment of trial court reversed.

*Beaumont, Smith & Harris* (*Alfred E. Lindbloom,* of counsel), for plaintiffs.

*Dykema, Wheat, Spencer, Goodnow & Trigg* (*H. Gordon Wood* and *Laurence D. Connor,* of counsel), for defendant.

*Amici Curiae:*

*Thomas G. Long, Edmund E. Shepherd,* and *Edward M. Sharpe.*

*Hubbard, Fox, Thomas & Born* (*Allison K. Thomas,* of counsel), for Michigan Conference of the United Church of Christ.

SMITH, J. This suit is the result of a split vote in the Mayflower Congregational Church of Detroit

(253 for and 204 against) over whether to become affiliated with the United Church of Christ, a relatively new denomination formed in recent years by a merger of the Evangelical and Reformed Church and a large number of assenting member churches of the Congregational Christian Churches of the United States, an association of autonomous churches.[1] Plaintiffs brought this class action as part of the 204-member minority of Mayflower who voted against their particular church becoming a part of the United Church of Christ. In brief, it is plaintiffs' claim that if the Mayflower Church becomes a part of the United Church of Christ, it would effect a change in the organizational structure and practices of the Mayflower Church, contrary to the faith and usages to which the church property has been dedicated. Plaintiffs say that as members of the "faithful minority"—that is, faithful to the historical precepts of congregationalism—they should have title to the church property quieted in themselves and others who, they allege, steadfastly adhere to these precepts. Defendant claims that the central issue of whether the merger resulting in the formation of the United Church of Christ effects a departure from congregationalism has already been decided in class actions (in which, defendant says, plaintiffs were effectively represented) in other cases in other States, all contrary to plaintiffs' claim.

This case comes to us on leave granted plaintiffs from a decision of the Michigan Court of Appeals (see 1 Mich App 252), which affirmed the judgment

---

[1] Much of the interesting history of the merger is elaborately detailed in other opinions and therefore need not be presented again. See 1 Mich App 252, but especially *Cadman Memorial Congregational Society of Brooklyn* v. *Kenyon* (1953), 306 NY 151 (116 NE2d 481), and *First Congregational Church and Society of Burlington, Iowa,* v. *Evangelical and Reformed Church* (CA 2, 1962), 305 F2d 724.

of the trial court dismissing plaintiffs' complaint on motion. The trial court found that there was "no genuine issue as to any material fact but only disputed questions of law, and that defendant Mayflower Congregational Church is entitled to judgment on its motion as a matter of law."

The trial court based its judgment upon a holding that in two prior class actions in the State of New York, which will be discussed in detail below, plaintiffs therein "represented a class of which plaintiffs in the present action were members and claimed and sought declarations of rights and interests in the subject matter of the litigation which included all the rights and interests asserted by plaintiffs herein." The trial court held, therefore, that plaintiffs were estopped by these two prior judgments from litigating the issues in the present complaint inasmuch as the matters are *"res judicata* as to such issues"*, to employ the trial court's terminology.

So much for the brief summary of what the case is about. It will be necessary, however, to examine the pleadings and contentions with added specificity and comprehensiveness because the issues are somewhat technical and rest almost entirely upon prior adjudications in other forums, the holdings of which are in serious dispute between the parties to this action.

First, we examine plaintiffs' complaint (filed June 22, 1961) which, as we have said, was dismissed on motion of defendant. Plaintiffs brought this class action characterizing themselves as part of the "faithful minority" which opposes the Mayflower Congregational Church becoming affiliated with the United Church of Christ. The Mayflower Church is an ecclesiastical corporation organized under PA 1901, No 53,[2] entitled "An act for the organization

---

[2] (CL 1948, § 458.301 *et seq.* [Stat Ann 1963 Rev § 21.1882 *et seq.*]).

of corporate Congregational churches." The complaint alleges that a union with the United Church of Christ would work a change in the congregational faith by substituting, in part at least, some measure of ecclesiastical control over member churches contrary to the historic principles of congregationalism which concededly have reposed in each church complete autonomy over its own affairs including, among other things, the power to ordain ministers and to call ministers to pastorates and to determine what are sacraments.

The complaint further alleges that although the constitution of the new United Church of Christ states that " 'the autonomy of the local church in the management of its own affairs is not subject to be abridged or impaired' [it] *nevertheless does abridge and impair what have been to this time and are today 'its own affairs' of the local church."* In pointing up this claimed contradiction the complaint further alleges that "(a) sacraments are dealt with in section 2 of the Constitution where it is stated, United Church recognizes two sacraments, 'baptism and the Lord's supper or holy communion'. *Thus, this subject is taken out of being one of 'its own affairs' of the local church.* (b) Ordination of minister is by section 27 declared a 'rite' of United Church * * * through an association. The person desiring ordination must apply to the association (bylaw 109). He is examined by 'the committee on the ministry of the conference and association' (bylaw 110). He is 'expected' to have studied in a 'theological seminary approved by the council for church and ministry' of the United Church (bylaw 104). *This is far from the existing practice by which ordination is by a conciliary council convened by the local church,"* reads the complaint. "Under this practice," it continues, "the association may be

called to act as the conciliary council but, if so, acts as an invitee and agency of the local church. Under the constitution and bylaws the association acts as the agency of the United Church and with sole and exclusive authority in respect of ordination. (c) Calling of a pastor is 'by such *procedure* as (the local church) shall determine' and is by the constitution stated to be one of 'its own affairs' of the local church *but this is limited to procedure and does not extend to the substantive who may be called, where from, and his qualifications,"* says the complaint.

In the same vein, the complaint continues: "The call is declared to be 'a concern of the church at large' (constitution 30). A minister of another denomination can be called only if the association grants him privilege of call, 'and this is done only after examination by the committee on the ministry of the conference and association' (bylaw 132). 'Installation or recognition' upon acceptance of a call is a function of the association (bylaw 128). (d) Amendment of the constitution is dealt with in section 88. *The amending power is solely in the general synod of the United Church and the conferences of that church. The local church has no voice in the amendment.* They merely have authority to look at a proposed amendment and possibly to protest against it. There is no limitation in the constitution on what may be done by way of amendment. While a local church if any amendment were unacceptable to a majority of the members of a local church voting thereon has authority 'to withdraw by its own decision from United Church * * * at any time without forfeiture of ownership or control of any real or personal property owned by it', *nevertheless the rights which are being asserted by this bill of complaint commonly referred to as the rights of a 'faithful minority' are completely cut off and extin-*

*guished when the local church becomes 'a part of the
United Church'.*"    (Italics in preceding paragraphs
are supplied.)

Defendant countered plaintiffs' complaint with a
motion to dismiss supported by affidavits replete
with materials from previously adjudicated cases.
The thrust of the motion was that matters raised
in plaintiff's complaint herein were raised in the
two prior lawsuits and "conclusively determined"
against plaintiffs.    The two cases figuring so im-
portantly in this litigation are (1) "the *Cadman
Case*" (*Cadman Memorial Congregational Society
of Brooklyn* v. *Kenyon* [1953], 306 NY 151 [116 NE
2d 481]), and (2) "the *Burlington Case* (*First Con-
gregational Church and Society of Burlington, Iowa,*
v. *Evangelical and Reformed Church* [CA 2, 1962],
305 F2d 724).

Defendant's motion asserts, among other things,
that the constitution of the United Church of Christ
does not and would not interfere with the historical
and traditional precepts of congregationalism in any
way and that expressly the autonomy of local
churches is preserved.    Supporting affidavits con-
tain a substantial discussion of the history of the
merger and defendant's view as to the holdings in
*Cadman* and in *Burlington*.    As aforesaid, the trial
court, agreeing with defendant, found no genuine
issue of fact and concluded that there was presented
only questions of law which the court held had been
decided adversely to plaintiffs.    Michigan's inter-
mediate appellate court, the Court of Appeals, af-
firmed without much discussion.    See 1 Mich App
252, at page 260.

On appeal in this Court, plaintiffs-appellants
argue that their complaint "alleges a classic case of
a faithful minority seeking to prevent a majority
from diverting property dedicated to the use of

a church to another denomination or to the support of doctrines fundamentally opposed to the doctrines of such church," citing *Michigan Congregational Conference* v. *United Church of Stanton* (1951), 330 Mich 561; *Davis* v. *Scher* (1959), 356 Mich 291; and *Immanuel Lutheran Church* v. *Fromm* (1962), 367 Mich 575. Plaintiffs say that in both *Cadman* and *Burlington,* upon which defendant relies, the rights of the "faithful minority" were *not* adjudicated. Plaintiffs say also that their complaint raises serious ecclesiastical questions of doctrine and polity of the United Church of Christ which have not been determined and could not have been determined in the two cases above cited. They insist that they have a right to go to trial for determination of the "fact question" of "departure", that is, whether the organization and doctrines of the United Church of Christ represent a departure from congregationalism. Defendant says that *Cadman* and *Burlington* have already determined that there is no departure "from the traditional doctrine and practice of the church." Both sides agree that the key issue is whether the New York case of *Cadman* determined this issue of departure.

What did *Cadman Memorial Congregational Society of Brooklyn* v. *Kenyon, supra,* decide? More particularly, did it decide the issue of departure?

Because of the sharp conflict between the parties as to what *Cadman* decided, we think it best to analyze the well-recorded holdings in *Cadman* from the trial court stage through intermediate and final appeals.

### *Cadman* in the Trial Court.

The Cadman Church of New York City brought suit in a class action, on behalf of themselves and other Congregational churches similarly situated,

against Helen Kenyon as moderator of the general council of the Congregational Christian churches. Plaintiff Cadman sought various relief against the council, including injunction and a declaratory judgment. The Cadman church had voted against the merger and brought action to halt the general council from proceeding with merger plans, claiming the council had no power to consummate merger with the Evangelical and Reformed Church. Defendant conceded that the general council claimed no power to compel a nonassenting congregational church to merge and become a part of the United Church of Christ. Cadman claimed a property interest in various properties and funds of boards and agencies of the general council of the Congregational Christian Churches. It was the Cadman allegation that such funds were "held or controlled in trust for the benefit" of Congregational Christian Churches, under their principles and practices.

In a lengthy opinion (197 Misc 124 [95 NYS2d 133]), the New York trial court found that significant amounts of property, largely money, were in the hands of several "boards, agencies and commissions" of the Congregational Christian churches, which were "held or controlled in trust for the benefit, work, interest and activities of the Congregational Christian Churches." The court then discussed with some particularity various provisions of the merger plan known as the "basis of union" and concluded that in several particulars the then proposed basis for merger between the Congregational Christian Churches and the Evangelical and Reformed church would, in the words of the court, constitute a "shift of authority from the [local congregational] church to the United Church of Christ." The court characterized another provision as "a radical departure." Still another provision of the "basis of union" was said to constitute a "throttling"

of the independence of the heretofore separate autonomous Congregational churches. A declaratory judgment was then entered in favor of plaintiff Cadman Church declaring that the general council had "no power or authority on behalf of or in the name of the separate churches to proceed with or carry out and consummate the basis of union of the Congregational Christian Churches and the Evangelical and Reformed Church." Concordant declarations were also made by the trial court that the general council "as a representative body" had no power to merge with the Evangelical and Reformed Church and so on. The defendant appealed.

*Cadman* in the intermediate appeals court.

The appellate division of the New York court reversed on the law and on the facts. In a memorandum opinion by the court ([2d Dept, 1952] 279 App Div 1074 [111 NYS2d 808]), the essential holding was stated as follows, p 1075:

"In controversies such as this, ecclesiastical or doctrinal questions may be inquired into only insofar as it may be necessary to do so to determine the civil or property rights of the parties. The civil courts do not interfere with ecclesiastical matters in which temporal rights are not involved. *Plaintiffs have failed to establish any right or interest in or to the funds and other assets which plaintiffs asserted were held in trust, which requires or permits a determination of the ecclesiastical issues presented.* The action was not brought upon the theory that the rights of the plaintiffs or other churches similarly situated, with respect to ownership and control of their individual properties and funds, would be in any way threatened or endangered by the proposed church union complained of. As to such rights and as to funds held under express trusts, there is no dispute between the parties. *As to other funds held by or*

*under the control of the defendant, it was not es-
tablished that they were received in any other way
than as absolute gifts or contributions, to be ex-
pended for specific objects or for defendant's usual
purposes.*" (Emphasis supplied.)

Consistent with its prior stated reasons, the ap-
pellate division guardedly ended its opinion in this
manner, p 1076:

"Findings of fact, expressed and implied, incon-
sistent with the foregoing, *except such findings as
were made expressly or by implication, upon ques-
tions of doctrine, polity and other ecclesiastical mat-
ters,* are reversed. For the reasons heretofore stat-
ed, *this court has not considered and has made no
determination upon the questions of fact arising
upon the issues as to such ecclesiastical matters.*"
(Emphasis supplied.)

Thereafter, the Cadman plaintiffs appealed the
case to the highest court in the State of New York,
the court of appeals.

## Cadman in the New York court of appeals.

After reciting the history of merger proceedings
as far as they had advanced to the point of suit,
the court of appeals analyzed the pleadings and is-
sues in this manner. (See 306 NY 151 [116 NE2d
481]). It stated that "According to its complaint
the plaintiff is proceeding upon the theory that the
proposed United Church of Christ is and will be
so alien and different in structure and polity that
fundamental congregational usage and practice will
be wholly lost and destroyed. By way of showing
such fundamental difference it points out that the
United Church of Christ will be a general or author-
itative church governed through various ecclesias-
tical bodies having degrees of sovereignty as distinct
from the existing voluntary and advisory associa-

tions, conferences, conventions, and general council; that the individual churches and members will be subordinate to control providing, as it does, for a central authority for the engaging and dismissal of ministers, the establishment of a system of church judicatories and for a united or uniform confession of faith in place of the absolute independence and freedom now and heretofore enjoyed in such matters by Congregational Christian Churches." (p 162.)

The court then stated that the answer of the general council conceded that if merger were consummated under the doctrine entitled "basis of union" the Cadman church and any other congregational church would not be subject to any control, in either the spiritual or temporal sphere, by the new United Church of Christ. After discussing further what the answer and concession of the general council meant, with reference to the autonomy of a congregational church under the merger plan, the court observed as follows, p 163:

"In short, there is no power and none is claimed by which the general council can compel or intends to compel the plaintiff Cadman or any other non-assenting church to join the union unwillingly or impose upon them a change of faith or doctrine. Union depends on voluntary action freely taken by independent autonomous churches. * * * Under these circumstances no ecclesiastical question is presented." Citing *Watson* v. *Jones,* 13 Wall (80 US) 679 (20 L ed 666).

The court returned to a consideration of whether consummation of the proposed merger based upon the document entitled the "basis of union" would interfere with any property rights possessed by the Cadman plaintiffs, with particular references to the funds and assets in various boards and agencies allegedly under control of the defendant general

council. It was immediately pointed out that all parties agreed that the funds and property held directly by the Cadman church were in no way "involved in or threatened" by the proposed union. The same agreement was had with reference to funds held by various agencies, boards, and instrumentalities under the general council under *express* trust, including pension funds. As the court pointed out, the dispute as to whether or not Cadman plaintiffs had any property interest which would give the court jurisdiction or authority to settle ecclesiastical questions attendant thereupon was confined solely to the property and funds in various agencies in which the Cadman plaintiffs claimed a *beneficial interest* under what might be termed an implied trust. Such funds although collected upon a per capita and apportionment basis were nevertheless conceded to be voluntary payments from individual churches or members, that is, with no compulsion from higher church bodies.

After discussing some of the work of the various boards and agencies such as the American Board of Commissioners for Foreign Missions and the Board of Home Missions, the Pilgrim Memorial Fund and others, the court concluded contrary to the contention of the Cadman plaintiffs, that is, that there was no beneficial interest of plaintiffs in such funds because, as the court found, *the funds were, in effect, donated* by various churches for general corporate purposes and that the donations were voluntary and without restrictions as to use or application.

The court then concluded as follows, p 167: "having established that the basis of union is voluntary and in no way interferes with Congregational faith or manner of worship, and the plaintiffs having failed to establish any direct or beneficial interest in and to the unrestricted funds of the general council, its various boards, agencies and instrumental-

ities, and having failed to show that any such general funds are to be used for other than authorized charter purposes, the complaint was properly dismissed on the merits."

### The *Burlington Case.*

The *Burlington Case*[3] brought in the Federal district court for the southern district of New York was a class action brought by another group of nonassenting Congregational churches, ministers, and members of various churches throughout the country. (In the *Cadman Case,* only the Cadman Church and Society were plaintiffs.) The defendants named in this action were not only the general council of the Congregational Christian Churches but also the Evangelical and Reformed Church and, in addition, all of the major boards and instrumentalities of the Congregational Christian Churches. (In *Cadman,* the moderator of the general council was the defendant.) Again, the nonassenters attacked the basis of union as being an illegal document which would impair the historical autonomy of the local congregational church. As to the allegations with respect to property rights, the plaintiffs in *Burlington* sought to show different property interests from the plaintiffs in *Cadman,* particularly certain mortgagors' interests. With respect to such claims, the United States court of appeals, second circuit, summarized the contentions of the Burlington plaintiffs and the court's ruling as follows (p 729):

"Since the plaintiffs here, as the district court found, also have made only voluntary contributions, if any, and no further charter violations are shown, the present plaintiffs were clearly members of the

---

[3] *First Congregational Church and Society of Burlington, Iowa,* v. *Evangelical and Reformed Church* (DC SD NY, 1961), 198 F Supp 677, affirmed (CA 2, 1962), 305 F2d 724, certiorari denied (1963), 372 US 918 (83 S Ct 728, 9 L ed 2d 723).

class represented by the Cadman church and society for purposes of resolving the status of the boards and agencies, and are bound by that decision.

"There remains the request made by the present plaintiffs for a declaration that ministers, members, and nonassenting churches may not be deprived of their rights in the assets, properties, and organizations of the Congregational Christian agencies and instrumentalities. *If they could show some right or interest adverse or dissimilar to that of the Cadman plaintiffs in these assets, et cetera, the present plaintiffs might prevail in their claim that the Cadman church and society could not adequately represent them in the litigation of such an issue. They have, however, made no such showing.* While they point to certain differences of interest, *no showing is made that these differences give plaintiffs here a claim or right to a declaratory judgment different from that asserted by Cadman.* And while such a separate claim or right might arise if, for example, a mortgage were foreclosed or a pension denied because of refusal to join the United Church of Christ, we cannot on the present record ascertain any imminently threatened interest which the present plaintiffs possess which so differentiates them from the Cadman plaintiffs, in terms of the issues there decided, that the Cadman plaintiffs could not adequately represent *all* the varying nonassenters." (Emphasis supplied.)

Defendants in *Burlington* claimed by way of defense *res judicata* and collateral estoppel, their contention being that representatively the same class and the same issues were before the Federal court as were before the New York court in the *Cadman Case*. The Federal district court ruled with defendants and on appeal the court of appeals for the second circuit affirmed. The court of appeals said (p 728):

"It is our conclusion that as to the issues actually raised and resolved by the New York court of appeals in *Cadman*, the plaintiffs therein and the present plaintiffs form one class having common interests, and all were adequately represented by the Cadman church and society. Since no legal issue not determined by Cadman is raised by the present complaint, the judgment of the district court dismissing plaintiffs' complaint must be affirmed."

## Positions of the Parties.

All the parties agree that this case must turn upon application of a facet of the doctrine of *res judicata*. The disagreement arises from the interpretation of the opinion of the New York court of appeals in *Cadman* and of the Federal court of appeals in *Burlington* and as to what these cases decided.

It is plaintiffs' position that the doctrine of *res judicata* does not preclude them from litigating the departure issue. They reason that the New York court of appeals in *Cadman* made no determination as to the "departure" issue because they had no jurisdiction to do so, there being no property interest shown. Plaintiffs maintain that the court of appeals affirming the appellate division, necessarily affirmed the express finding of the appellate division that no jurisdiction existed to determine ecclesiastical questions, including the question of departure. As to the *Burlington* decision, plaintiffs argue that the Federal court of appeals decision is binding upon defendant insofar as it held that it was unclear whether the departure issue was decided in *Cadman* on the merits. Plaintiffs base this contention upon the following from this significant footnote in the opinion of the court of appeals in *Burlington* (p 729):

"While it is not wholly clear from the court of appeals decision whether it upheld the basis of union on the merits or because the question of its invalidity was beyond the cognizance of the civil courts, it would make no difference to resolution of the issues presented here which of these grounds of decision was in fact adopted."

It is the position of defendant that plaintiffs are precluded by *res judicata* from litigating the departure issue. It maintains that the departure issue was decided on the merits contrary to plaintiffs' position, in both *Cadman* and *Burlington*. Defendant argues that the decisions in *Cadman* and *Burlington* were essentially the same as in the instant case, both as to parties and issues, that plaintiffs are members of the class represented in both prior suits, and are therefore barred by the doctrine of *res judicata* from litigating the departure issue in the present suit. Defendant in answer to plaintiffs' claim that the court of appeals in *Cadman* lacked jurisdiction to determine the departure issue, claims quite to the contrary that the court "*did* have the power to consider and dispose of plaintiffs' allegations regarding departures from Congregationalism involved in the union. The court found not only that the act of uniting was voluntary," says defendant, "but also that the churches would remain free in the United Church. * * * *This adjudication as to the freedom of churches is the critical 'departure issue' in this and the prior actions and has already been adjudicated against present plaintiffs,"* argues defendant. (Emphasis supplied.)

Defendant bases this contention upon the following language from the New York court of appeals in *Cadman:*

"According to its express terms, the basis of union recognizes the local church as the basis of organ-

ization, and that the conferences, conventions and associations shall 'conduct its business in its own way' by providing that each congregation, association, and conference 'has the right of retaining or adopting its own charter, constitution, bylaws and other regulations which it deems essential and proper to its own welfare'; in other words that there will be no intrusion in or abridgement of traditional congregational polity and usage through fellowship of independent autonomous congregations, free of authoritative control." 306 NY 151, 161, *supra*.

Plaintiffs assert that the language relied upon by defendant in the court of appeals decision in *Cadman* is based upon concessions by the parties, and that concessions cannot be relied upon as a basis for a plea of *res judicata*. Defendant answers that under New York law concessions are a proper basis for a plea of *res judicata*. Both plaintiffs and defendant have raised many other issues which need not be considered here. Two *amicus* briefs were also submitted, which have been both instructive and helpful.

### Statement of Issues.

The overriding issue presented in this case is whether *res judicata*, or more precisely, the doctrine of collateral estoppel precludes plaintiffs from litigating the departure issue in view of the decisions in *Cadman* and *Burlington*. When employing the term "departure", we mean whether, *if* an autonomous congregational church merged with the United Church of Christ, a change in religion would result, insofar as the congregational church was concerned. This is in contradistinction to the issue of whether a particular congregational church could be compelled by the general council to join the United Church. It is conceded in *Cadman* that there was no such power in the council. The autonomous

congregational churches were conceded to have the
authority to vote whether to join or not to join.
But, did *Cadman* or *Burlington* decide that if, by
majority vote, a particular church of the congrega-
tional faith voted to merge with the United Church
of Christ and take the church property with it, the
tenets and practices of the United Church would
be so different from that of congregationalism that
so to adhere would constitute a "departure" from
congregationalism?

## Decision.

First, we are called upon to construe what the
court of appeals of New York decided in *Cadman*.
Recapitulating, the trial court in *Cadman* made two
findings, essentially: (1) that the Cadman plain-
tiffs had a property interest in funds in various
agencies and boards under control of the general
council; and (2) that, as an ecclesiastical matter,
the doctrine and polity of the United Church of
Christ as contained in the "basis of union" reflected,
in part at least, a departure from congregationalism.
In reversing the trial court, the appellate division
of the New York supreme court reversed both on
the law and the facts.   The appellate division found,
contrary to the trial court, that the Cadman plain-
tiffs had *no* property interest in the various funds
already mentioned above.   Finding no property in-
terest in *Cadman,* the appellate division expressly
refrained from "questions of doctrine, polity and
other ecclesiastical matters."   In other words, it
declined to discuss the departure issue because it
felt that in finding no property interest, the court
had no jurisdiction to entertain these ecclesiastical
questions.   This latter position is made emphatic
by the contemporaneous writing of the dissenting
justice who wrote: "I cannot agree that the trial

court had no jurisdiction to determine this mat-
ter." (279 App Div 1074, 1076 [111 NYS2d 808,
811].) He went on to indicate that he thought a
property interest had been shown sufficient to con-
fer jurisdiction *to decide* the ecclesiastical question.

In affirming the judgment of the appellate divi-
sion, the New York court of appeals made it clear
that neither the property held directly by the Cad-
man church, nor the funds held by the general coun-
cil under *express* trusts were involved in the suit.
The only property in dispute were those funds in
which the Cadman plaintiffs claimed a "beneficial
interest." As to such funds in possession of the
several boards and agencies of the general council,
the court of appeals held that under the circum-
stances, "such funds were general gifts for use by
the corporations [various boards] in connection with
their general corporate purposes." The court held
that such "unrestricted contributions" create no
proprietory or beneficial interest in the Cadman
plaintiffs as would warrant interference by the civil
court, unless, the court added, it should appear that
their use would be violative of corporate or charter
purposes, which was not claimed nor shown. The
court of appeals, therefore, found, as did the ap-
pellate division, no property interest in the funds
had been established by the Cadman plaintiffs.

The paragraph in the *Cadman* opinion of the New
York court of appeals about which there is so much
dispute is quoted in full herewith (pp 162, 163):

"The general council in its answer concedes that
under the basis of union the plaintiff and any other
Congregational Christian church, association, or
conference, or their members, would not be subject in
respect 'to either their spiritual or temporal affairs
to any control by the proposed United Church of
Christ,'—that the proposed expression of faith set
out in the basis is not to be considered a substitu-

tion for any confession of faith which may be used
in any congregation and 'shall be regarded as a tes-
timony and not as a test' and that freedom of wor-
ship and education at present enjoyed 'will be pre-
served in the United Church  *  *  *  [and] not
*  *  *  abridged'.   These clear and unequivocal
admissions afford assurance that the proposed un-
ion will in no way change the historical and tradi-
tional  pattern  of  the  individual  Congregational
Christian church.   They serve to remove all fear
that any action taken by the general council leading
to a consummation of the basis of union will in
any way obligate the individual church to join in
the union except through its own voluntary action.
Every possible assurance is given that each member
church will continue to possess the same freedom
of faith and manner of worship as heretofore en-
joyed—that there will be no interference in or
abridgment of congregational usage and practice.
In short, there is no power and none is claimed by
which the general council can compel or intends to
compel the plaintiff Cadman or any other nonassent-
ing church to join the union unwillingly or impose
upon them a change of faith or doctrine.   Union de-
pends on voluntary action freely taken by inde-
pendent autonomous churches.   If any doubt re-
mains, it seems abundantly clear from this record
that the very nature of congregationalism, surviving
as it has the vicissitudes of time for nearly 400
years, assures the integrity of the individual Con-
gregational Christian church, its faith and inde-
pendence.   Under these circumstances no ecclesias-
tical question is presented.   (*Cf. Watson* v. *Jones,*
13 Wall [80 US] 679 [20 L ed 666].)"

Defendant, in construing the *Cadman* opinion,
says that the court of appeals "found not only that
the act of uniting was voluntary, but also that
the churches would remain free in the United
Church.  *  *  *  *This adjudication as to the free-
dom of the churches is the critical 'departure issue'*

in this and the prior actions and had already been adjudicated against the present plaintiffs." (Emphasis supplied.)

Plaintiffs in the present action say that this is what *Cadman* means: "Cadman said the basis of union was valid because a nonassenting church could not be compelled to join the United Church of Christ. *However, if a Congregational church votes to join the United Church of Christ, and these alleged differences amount to a departure from Congregationalism,* the church may not take the property into the United Church of Christ. The issue presented in the present action is whether there [sic] differences amount to a departure." (Emphasis supplied.)

Part of the confusion about what *Cadman* means is occasioned by the fact that the highest appellate authority in New York, the court of appeals, added another slightly different reason for its decision than did the appellate division which it affirmed.[4] The appellate division followed the conventional pattern of deciding a church dispute, that is, by determining if a property interest was involved sufficient to confer jurisdiction or power to decide the ecclesiastical question. The appellate division found *no* property interest in the Cadman plaintiffs and, therefore, expressly refrained from ruling on ecclesiastical questions.

However, although the New York court of appeals held with the appellate division on the property issue, it added a point which furnishes the chief bone of contention. As to the property issue, it said: (1) that plaintiffs had "failed to establish any direct or beneficial interest in and to the unresticted funds of the general council, its various boards,

---

[4] This practice is thought not to be unknown in appellate court circles.

agencies and instrumentalities"; and (2) that plaintiffs also "failed to show that any such general funds are to be used for other than authorized charter purposes." Curiously, the court of appeals added a finding "that the basis of union is voluntary and in no way interferes with Congregational faith or manner of worship." This latter expression, along with other isolated expressions of a similar nature contained in the *Cadman* opinion, are said to be a decision on the departure issue. When read in conjunction with parts of the opinion, together with the issues before the court on appeal from the appellate division, the only logical conclusion that can be reached, however, is that not only did the court of appeals not consider the departure question but also that it had no jurisdiction or power so to do because there were no property interests shown so as to confer jurisdiction to decide this ecclesiastical question. In this connection, we acknowledge the helpfulness of the brief *amicus* filed in support of plaintiffs' position.

What the court of appeals in *Cadman* said about the "basis of union * * * [being] voluntary" is consonant with its earlier expressions set forth in the highly disputed paragraph from *Cadman* quoted in full above. There it reads: "In short, there is no power and none is claimed by which the general council can compel or intends to compel the plaintiff Cadman or any other nonassenting church to join the union unwillingly or impose upon them a change of faith or doctrine." Then the court added emphatically that "Union depends on voluntary action freely taken by independent autonomous churches." It concluded the discussion by saying that "Under these circumstances no ecclesiastical question is presented." Significantly then, the reader was asked to compare "(*Cf.*)" *Watson* v. *Jones,* 13 Wall (80 US) 679 (20 L ed 666).

*Watson* is a many faceted case which contains important dicta with reference to congregational churches upon which the *Cadman* court obviously leaned. The holding in *Watson,* however, had to do simply with a church dispute of a different denomination from *Cadman.* The 1871 case of *Watson* found a proslavery and an antislavery group competing for the use of church property of a particular church in Louisville, Kentucky. The highest judicatory body of the Presbyterian church, the general assembly, declared the antislavery group to be the "true and lawful Presbytery of Louisville." The Kentucky court decided against the general assembly, but was reversed by the United States Supreme Court which held that in a church where congregations are subordinate members of a general church organization, and the highest judicatory body has determined questions of discipline, or of faith, or of ecclesiastical rule, then the civil courts must accept such determination as final.

The important dicta in the case sought to sum up the types of disputes which occurred in religious bodies and to suggest the governing principles for each. The Supreme Court divided the problems into three classifications:

"1. The first of these is when the property which is the subject of controversy has been, by the deed or the will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.

"2. The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.

"3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." 13 Wall (80 US) 679, 722, 723.

The only applicable portion of *Watson* v. *Jones* which applied in *Cadman* was that part of *Watson* devoted to the second classification of cases, namely those of congregational or other independent, autonomous organizations. Of this type of case, the court in *Watson* had this to say: (pp 724, 725)

"The second class of cases which we have described has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government; and to property held by such a church, either by way of purchase or donation, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society.

*"In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations.* If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to use of the property. The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights

in the property from the fact that they had once been members of the church or congregation. This ruling admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization; for, if such was permitted, a very small minority, without any officers of the church among them, might be found to be the only faithful supporters of the religious dogmas of the founders of the church. There being no such trust imposed upon the property when purchased or given, the court will not imply one for the purpose of expelling from its use those who by regular succession and order constitute the church, because they may have changed in some respect their views of religious truth."

It having already been conceded by defendant in *Cadman* and thereupon found by the trial court that the general council neither claimed nor had authority to compel a nonassenting member congregational church—as was the Cadman church—to join the United Church, there obviously was no necessity for the New York court to get into such ecclesiastical questions as to whether the United Church represented a departure from the doctrine and polity of the Congregational Christian churches, including the Cadman church. In short, the general council could not compel a nonassenter, it being conceded that union was voluntary. Cadman being a nonassenter had, in a sense, "volunteered" not to become a part of the United Church. Therefore, the argument was at an end. There was no need for the court to delve into various ecclesiastical questions of the "what if?" type, that is, what if Cadman had, by majority vote, decided to affiliate with the United Church? Or what if the other congregational churches elected to affiliate, would the doctrine, polity and practices of the United Church be so different as to constitute a "departure" from historic congregationalism?

The New York court of appeals did not attempt to answer all of these questions to which the Cadman plaintiffs sought specific declarations. It merely sought to determine if a union would be voluntary. Once having done that, there was no need, even in such a comprehensive format, to render a declaratory judgment as to whether the doctrine and polity of the United Church represented a departure from congregationalism. If one was not compelled to join, and elected not to join, then one need not surmise what the climate might be if he did.

By referring to *Watson* v. *Jones,* the New York court was indicating its awareness and probable approval of the only relevant portion of the *Watson Case,* that is, that part having to do with congregational type churches. *Watson* said, as to such churches, when schisms develop in a particular local autonomous congregational church over whether one segment of such a church is about to depart from historic precepts and practices, then, in the absence of an express trust imposed upon the use of the church property, the rules that govern are those which apply to nonreligious voluntary associations. See 62 Mich L Rev 419, 436 (1963).

Another clarification is in order. The citation in *Cadman* to *Watson* v. *Jones* relative to the law of voluntary associations, appears, clearly from the quote from *Watson,* to refer to the law of voluntary associations as it applies to local church units. As already indicated, in this regard, the *Cadman Case* was simply trying to say that so long as the general council had no power to compel an individual church to join, then that resolved that particular issue, leaving it to each individual church, *under the rules governing voluntary associations* to join or not to join. Obviously, this had no application to the Cadman plaintiffs because they had already voted *not*

*to join,* but it was instructive dicta aimed at possible future litigants.

Thus, by way of summary of *Cadman,* we may say this: that the New York court of appeals clearly sustained the finding of the appellate division that the Cadman plaintiffs had shown no property interest in the funds held by the various boards and agencies of the general council. It might have ended there, as did the appellate division, but, for reasons of its own, the court added another point to its rationale in *Cadman,* that is, that the union with the United Church was conceded to be voluntary and that the general council claimed no power nor had any power to compel a nonassenting church such as Cadman to join the United Church, and thus, under such circumstances, there was no need to discuss alleged doctrinal differences (ecclesiastical questions) between historic congregationalism and the proposed tenets of the United Church as then expressed in the basis of union. To our way of thinking, the court was making what was already clear also emphatic!

The unquestioned clincher in all this discussion as to what *Cadman* means is the fact that the almost universal holding of courts in this country is that a civil court has no jurisdiction over ecclesiastical questions unless property rights are involved. *Watson* v. *Jones, supra; Everson* v. *Board of Education of Township of Ewing,* 330 US 1 (67 S Ct 504, 91 L ed 711, 168 ALR 1392); *Zorach* v. *Clauson,* 343 US 306 (72 S Ct 679, 96 L ed 954); *Kedroff* v. *St. Nicholas Cathedral,* 344 US 94 (73 S Ct 143, 97 L ed 120); 45 Am Jur, Religious Societies, Decisions as Conclusive; Supervisory Power of Civil Courts, § 41, pp 750–752; 76 CJS, Religious Societies, Jurisdiction and Power of Civil Courts in General, § 86, pp 873–878; *Rector, Church of Holy Trinity* v.

*Melish,* 4 App Div 2d 256 (164 NYS2d 843); *Davis*
v. *Scher,* 356 Mich 291.  Having affirmed that Cad-
man plaintiffs had shown no property interests in
council funds, we have no doubt that the New York
court of appeals was keenly aware of its own juris-
dictional limitations and thus did not consciously
take up any ecclesiastical questions, any idle phrases
suggesting such to the contrary notwithstanding.

The *Burlington Case,* already cited, was brought
in the Federal district court for the southern district
of New York several years after *Cadman* had been
concluded in the state courts of New York.  It was
brought on the eve of merger between a large num-
ber of assenting member churches of the Congrega-
tional Christian Churches and of the Evangelical
and Reformed Church.  Plaintiffs in *Burlington* in-
cluded a number of nonassenting ministers, members
of churches, members of boards and agencies, and
churches with mortgages held by the Church Build-
ing Society, all of the Congregational Christian
Churches.  Defendants were the Evangelical and Re-
formed Church, the United Church of Christ, the
treasurer of the general council, and various boards,
corporations and agencies of the general council.
Plaintiffs claimed that the added parties constituted
a different class from that in *Cadman,* and that their
interests in the funds held by or under control of
the general council removed the *Burlington Case*
from the rule of *res judicata* as to issues decided in
the *Cadman Case.*  From a judgment for defendants,
plaintiffs appealed to the court of appeals for the
second Federal circuit.  There, the decision was af-
firmed.  The court said "It is our conclusion that
*as to the issues actually raised and resolved* by the
New York court of appeals in *Cadman,* the plaintiffs
therein and the present plaintiffs form one class
having common interests, and all were adequately

represented by the Cadman Church and Society."
305 F2d 724, 728. (Emphasis supplied.)

The court went on further to say (p 729) "There
remains the request made of the present plaintiffs
for a declaration that ministers, members and non-
assenting churches may not be deprived of their
rights in the assets, properties and organizations
of the Congregational Christian agencies and in-
strumentalities. If they could show some right or
interest adverse or dissimilar to that of the Cadman
plaintiffs in these assets, et cetera, the present plain-
tiffs might prevail.  *  *  *  They have, however,
made no such showing." The court then went on
further to add this: "And while such a separate
claim or right might arise if, for example, a mort-
gage were foreclosed or a pension denied because
of refusal to join the United Church of Christ, we
cannot on the present record ascertain imminently
threatened interest which the present plaintiffs pos-
sess which so differentiates them from the Cadman
plaintiffs, in terms of issues there decided, that the
Cadman plaintiffs could not adequately represent
*all* the varying nonassenters."

The Federal court of appeals in *Burlington* clearly
planted its decision on the *Cadman Case* as to issues
actually raised and litigated by the parties in *Cad-
man* which the court found to be of the same repre-
sentative class in *Burlington* as in *Cadman*.

It was also quite clear that the Federal court in
*Burlington* had some difficulty with the language in
the *Cadman Case* with respect to the ecclesiastical
issue of departure. The *Burlington* court, having
already decided that the parties and issues were es-
sentially the same in *Burlington* as in *Cadman,* deft-
ly handled the question of whether the *Cadman* court
had touched upon the ecclesiastical dispute in this
manner: "While it is not wholly clear from the court

of appeals [New York] decision whether it upheld the basis of union on the merits *or* because of the question of its invalidity was beyond the cognizance of the civil courts, it would make no difference to resolution of the issues presented here which of these grounds of decision was in fact adopted." 305 F2d 724, footnote at page 729.

The precise legal problem is one of collateral estoppel and the question may now be asked if the Berkaw plaintiffs in this present action are collaterally estopped from litigating issues raised in their complaint as to whether or not there would be a departure from congregationalism if the Mayflower Church joined the United Church of Christ? We think the answer is "no".

As to collateral estoppel concerning fact questions, a good statement of the rule is contained in Restatement, Judgments, § 68(2), p 293:

"A judgment on one cause of action is not conclusive in a subsequent action on a different cause of action as to questions of fact not actually litigated and determined in the first action."

Michigan is in accord with this statement. See leading case of *Jacobson* v. *Miller,* 41 Mich 90, and *Jones* v. *Chambers,* 353 Mich 674. For the rule of collateral estoppel as applied to questions of law, see Restatement, Judgments, § 70, p 318.

In view of the fact that neither *Cadman* nor *Burlington* decided the ecclesiastical question of departure, present plaintiffs (assuming they are within a class represented by the *Cadman* and *Burlington* plaintiffs) are not precluded from litigating the issues raised in their complaint.

We are invited to review similar cases decided in the courts of Ohio, Wisconsin, and Wyoming, which cases apparently reached results opposed to what we now decide. We decline to do so, not only for

the reasons fully explaining our decision above, but
also because the cases to which we are invited pre-
sent no opinions giving insight into their judgments.
These cases are fully cited in the Michigan Court
of Appeals decision at 1 Mich App 252, 257. The
cases in the Wisconsin and Wyoming courts were
decided in the trial courts without opinion or ap-
pellate review. The Ohio case, in its brief judgment,
seems to turn on other issues. Therefore, no useful
purpose would be served by a discussion of any of
them.

Reversed and remanded for further proceedings.
Costs to appellants.

T. M. KAVANAGH, C. J., and DETHMERS, KELLY,
SOURIS, O'HARA, and ADAMS, JJ., concurred.

BLACK, J. (*concurring in reversal*). At this yet
"summary" stage of a five-year old chancery case,
I do not care to commit my signature beyond holding
that the defendant has failed to sustain the first
requisite of its motion to dismiss (filed under former
Court Rule No 18, § 1[e] [1945]). That requisite was
and yet remains proof that the present plaintiffs
"are members of the class represented by the plain-
tiffs therein" (referring to *Cadman*) and that "The
plaintiffs herein, having been members of the class
represented in the Federal district court action, are
concluded by the adjudications made therein" (refer-
ring to *Burlington*).[1]

Since it is not claimed that the present parties
plaintiff were parties in the ordinary sense to either
of the two mentioned prior actions, defendant's said
motion to dismiss required for support something
more than a pure conclusion of deposed fact and
law; such conclusion being that the present plaintiffs

---

[1] For all of the official citations of *Cadman* and *Burlington*, see
Justice SMITH'S opinion, *ante* at page 241.

were represented by actual parties to such prior actions and became legally bound in that manner to whatever adjudications as were made therein.

Just why detailed proof, of the alleged fact of representation of these plaintiffs by others in *Cadman* and *Burlington,* was not offered or supplied below is not explained. The want of such proof calls properly for a negative answer to defendant's counterstated first question and for the withholding of answer to its second question. The two questions appear in the margin.[2]

This case is another example of that imprudent practice which seems to burgeon evermore in our metropolitan trial courts, that is, the practice of summary riddance of cases on summary motion as a means of keeping abreast—at very least—of a backlog that seems to grow faster as dispositions are made. Only last year( *R.R. Improvement Ass'n* v. *Thomas,* 374 Mich 175, 187) this Court found it necessary to advise that, "our metropolitan circuits being burdened as they are, it is better to let the work of the circuit get farther and farther behind than to crank a judicial meatgrinder the unjust output of which is simply a great number of 'cases disposed of'." Such advices were given after the Court had noted again the exasperation as well as disservice which stems usually from the cursory disposition of chancery cases without the previous taking of such proof as may fairly be indicated for the *de novo* (should there be an appeal) determination of all pleaded issues (pp 177, 178):

---

[2] "(1) Were the plaintiff's in this action members of the classes represented by the class plaintiffs in the two prior actions concerning the union of the Congregational Christian Churches and the Evangelical and Reformed Church?"

"(2) Assuming that the plaintiffs herein were members of such classes, are they now prevented from maintaining this action, as the lower courts held, on principles of *res judicata* and estoppel by judgment by reason of the judgments in the prior actions?"

"On too many occasions in recent years this Court has found it necessary to remand equity cases for a reason known specially to equity's jurisdiction. See *Sternberg* v. *Baxter,* 373 Mich 8, 18; *Falkner* v. *Brookfield,* 368 Mich 17, 25; *Kent* v. *Bell,* 368 Mich 443, 451; *Kenney* v. *Village of Novi,* 367 Mich 75, 76, 77, and *Crocker* v. *Crocker,* 362 Mich 6, 8, all of which quote or cite *Culy* v. *Upham,* 135 Mich 131 (106 Am St Rep 388). In *Culy* v. *Upham* this regularly quoted passage appears (p 135):

" 'We do not wish, by our silence, to seem to approve the procedure adopted in this case. If we had disagreed with the trial judge on the legal proposition discussed in this opinion, we could not have made a final disposition of the case. We should have been forced to remand the record for another hearing in the court below. As a general rule, suits at chancery should be so tried in the lower court that, when they are appealed, this Court may finally dispose of the issue raised by the pleadings.' "

The quoted rule in mind, it is appropriate to say that, defendant's deficient motion to dismiss and orders upholding same having intervened, the very purposes touted in behalf of summary justice have been defeated. What should have been done in recent years, and must yet be done, has not even commenced. It would seem, then, that this Court might serve the administration of justice better by advising the trial bench anew that equity cases are to be handled pertinently as equity cases, just as was recommended sixty odd years ago when *Culy* v. *Upham* was handed down; also that summary disposition of equity cases on technical grounds should be discouraged in favor of enough at least by way of formal hearing as will permit full play of equity's intended jurisdiction. Had this case come to due hearing in accordance with our then recently reaffirmed suggestion (*per curiam, Crocker, supra*), it

would in all probability have matured by this time to decretal final judgment.

I would reverse and remand with direction that an order enter in circuit denying defendant's said motion. Plaintiffs should have costs of both appellate courts.