PINCKNEY COMMUNITY SCHOOLS v CONTINENTAL
CASUALTY COMPANY

Docket No. 163986. Submitted January 18, 1995, at Lansing. Decided
September 22, 1995, at 9:10 A.M. Leave to appeal sought.

Pinckney Community Schools brought an action in the Livingston
Circuit Court against Continental Casualty Company and other
liability insurers for reimbursement of amounts expended by
the plaintiff to satisfy an award made by the Department of
Civil Rights to one of the plaintiff's teachers as the result of a
complaint claiming discrimination on the basis of gender that
had been filed with the department on December 18, 1981. In
March 1982, the plaintiff notified Continental that the com-
plaint had been filed. The claims-made liability policy issued by
Continental to the plaintiff for the period of April 1, 1979, to
April 1, 1982, provided for payment of a loss "if during the
policy period any claim or claims" were made against the
plaintiff and if the plaintiff gave Continental written notice
within one year of receiving notice of a claim that arose during
the term of the policy. On receiving the March 1982 notice
from the plaintiff, Continental acknowledged receipt of the
notice and subsequently indicated that it had assigned a claim
number. The complaint languished before the Department of
Civil Rights until 1988, when the department investigated the
claim, leading the department to issue a formal complaint
against the plaintiff that resulted in a finding of gender-based
discrimination and entry of a monetary award for the teacher.
When Continental declined coverage, the plaintiff satisfied the
award and commenced the action to seek insurance benefits.
The court, Stanley J. Latreille, J., granted summary disposition
for Continental on the basis that the charge filed with the
Department of Civil Rights was not a claim within the meaning
of the insurance policy but rather was only a notice of an
impending investigation. The plaintiff appealed.

The Court of Appeals *held:*

1. The language of Continental's policy placed no special

REFERENCES

Am Jur 2d, Insurance § 277.
See ALR Index under Insurance and Insurance Companies.

limitation on the definition of the term "claim" as used in the policy; therefore, "claim" is deemed to have its generally accepted meaning of a demand on another for something due or asserted to be due.

2. Because of the sweeping powers granted to the Department of Civil Rights with respect to enforcement of the rights guaranteed under the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, including the power to issue charges, to hold hearings, and to order corrective actions, the payment of compensation and attorney fees, and the payment of fines, a complaint filed with the department is the functional equivalent of a complaint in court. Accordingly, the filing of the complaint with the department served as more than a mere notice of an impending investigation, rather it amounted to a demand for payment of the compensation that the teacher asserted to be due and was thus a claim within the meaning of Continental's policy. Indeed, Continental's own actions indicated that it was treating the filing of the complaint with the Department of Civil Rights as the beginning point of a claim within the meaning of its policy.

3. The gravamen of the complaint filed by the teacher with the Department of Civil Rights was a charge of gender-based discrimination prohibited under the Civil Rights Act. Accordingly, the obligation placed on the plaintiff by the award that resulted from that complaint did not fall within the contractual-obligation exclusion of the insurance policy.

4. Because the actions of Continental on being notified of the civil rights complaint could have led the plaintiff to believe that it had perfected a timely claim under the policy and thereby induced the plaintiff not to take additional actions to protect its claim under the policy, Continental is estopped from now claiming that the plaintiff did not make a timely claim.

5. Because genuine issues of fact remain and Continental is not entitled to a judgment as a matter of law, the trial court erred in granting summary disposition for Continental.

Reversed and remanded.

CAVANAGH, P.J., dissenting, stated that a claim for the purpose of a claims-made insurance policy must include a present demand of a right of payment of an amount due and cannot be the mere awareness of a possible claim. A complaint filed with the Department of Civil Rights serves only as a notice of an investigation that might lead to a possible claim and, thus, does not constitute a claim within the meaning of the policy at issue. Under the circumstances, the trial court properly granted summary disposition on the basis that a timely claim had not been made within the meaning of the policy.

WORDS AND PHRASES — "CLAIM" — INSURANCE — CIVIL RIGHTS ACT.
  A complaint filed with the Department of Civil Rights seeking
    relief pursuant to the Civil Rights Act is a claim within the
    meaning of a claims-made insurance policy where there is no
    specific language in the insurance policy giving the term
    "claim" a restrictive meaning that would specifically preclude
    such a complaint from constituting a claim under the insur-
    ance policy (MCL 37.2101 *et seq.*; MSA 3.548[101] *et seq.*).

*Thrun, Maatsch & Nordberg, P.C.* (by *Martha J. Marcero* and *Timothy R. Winship*), for the plaintiff.

*Meagher & Geer* (by *Christian A. Preus*) and *Kerr, Russell & Weber* (by *Roy H. Christiansen*), for the defendant.

Before: CAVANAGH, P.J., and HOLBROOK, JR., and MARKEY, JJ.

MARKEY, J. Plaintiff appeals as of right from an order granting summary disposition for defendant Continental Casualty Company (hereinafter defendant) pursuant to MCR 2.116(C)(10). We reverse and remand for further proceedings.

On March 16, 1979, plaintiff renewed its insurance policy with defendant. The policy, in effect from April 1, 1979, to April 1, 1982, provided coverage for claims against plaintiff for "Wrongful Acts," defined as "any actual or alleged errors . . . or act or omission or neglect or breach of duty by the Assureds in the discharge of their duties."

In 1978, plaintiff hired Douglas Rutherford as a physical education instructor. In August 1981, Rutherford was laid off from his full-time job because of financial problems in the school district. Rutherford was assigned a part-time position teaching physical education at a district middle school. However, at the same time, plaintiff hired a full-time female instructor to teach a physical

education class for girls at the same school where Rutherford had been employed full-time.

On December 18, 1981, Rutherford filed a charge of discrimination with the Department of Civil Rights (DCR), alleging that he was discriminated against on the basis of his sex in violation of the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*

The DCR notified plaintiff of Rutherford's charge. In March 1982, plaintiff in turn notified defendant, which acknowledged receipt of the information in a letter and informed plaintiff that it had assigned a claim number to the case. Defendant also stated that if Rutherford were to file a lawsuit, defendant would review the complaint and make a coverage determination at that time.

Between 1981 and 1988, Rutherford's claim languished at the DCR. The delay was due in part to the illness of the investigator and to budget cuts at the DCR; in addition, the file may have been misplaced for a time. Eventually, the DCR investigated Rutherford's claim. On May 10, 1989, the DCR issued a formal complaint against plaintiff. In an opinion and order dated October 29, 1989, the DCR concluded that plaintiff had discriminated against Rutherford on the basis of his sex and awarded Rutherford monetary damages for lost wages for the 1981-82, 1982-83, 1983-84, and 1985-86 school years.

Plaintiff informed defendant of the award to Rutherford, but in a letter dated July 16, 1990, defendant declined coverage. On June 17, 1991, plaintiff satisfied the judgment by paying $67,737.46 to Rutherford.

On February 5, 1992, plaintiff filed a complaint against defendant and three other insurance companies. Plaintiff sought indemnification for the liability payment to Rutherford and for attorney

fees and costs incurred in defending the action. Plaintiff and defendant both filed motions for summary disposition pursuant to MCR 2.116(C)(10). The trial court denied plaintiff's motion and granted defendant's motion on the basis that Rutherford's 1981 charge filed with the DCR did not constitute a claim but was merely an allegation of sex discrimination and notice of an impending investigation. Plaintiff's claims against the other three insurance companies were also dismissed. Plaintiff appeals only the trial court's grant of summary disposition for defendant.

Because plaintiff timely notified defendant in writing of Rutherford's DCR complaint (and the concurrent complaint filed with the Equal Employment Opportunity Commission [EEOC]) filed against plaintiff and because the DCR complaint constituted a "claim" under defendant's "claims-made" insurance policy, we believe that the trial court erred in granting defendant's motion for summary disposition brought pursuant to MCR 2.116(C)(10).

On appeal, an order granting or denying summary disposition is reviewed de novo. A motion for summary disposition may be granted pursuant to MCR 2.116(C)(10) when, except with regard to the amount of damages, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Giving the benefit of reasonable doubt to the nonmoving party, the trial court must determine whether a record might be developed that would leave open an issue upon which reasonable minds might differ. *Michigan Mutual Ins Co v Dowell,* 204 Mich App 81, 85-86; 514 NW2d 185 (1994).

Defendant's policy provided coverage only for claims made "during the policy period." Thus, the policy is a "claims-made" policy. In general, a "claims-made" policy provides coverage no matter

when the alleged error, omission, or act of negligence occurred as long as the misdeed is discovered and the claim for indemnity is made within the policy period. *Stine v Continental Casualty Co,* 419 Mich 89, 97; 349 NW2d 127 (1984). Defendant's insurance policy provided coverage for plaintiff in accordance with the following liability insurance provisions:

I. The Insurer designated in the declarations . . . in consideration of the payment of the premium and subject to all of the terms, conditions and limitations of this policy agrees as follows:

* * *

(c) With the School District that if during the policy period any *claim or claims are made against it as a result of any Wrongful Act occurring during the policy period,* the insurer will pay on behalf of, in accordance with the terms of this policy, all loss which the School District shall become legally obligated to pay.

* * *

III. Definitions:

* * *

(c) Wrongful Act shall mean any actual or alleged errors or misstatement or misleading statement or act or omission or neglect or breach of duty by the Assureds in the discharge of their duties, individually or collectively, or any matter claimed against them solely by reason of their being or having been Assureds during this policy period.

(d) *Loss shall mean* any amount which the Assured or School District are [sic] legally obligated to pay, including, but not limited to, *any amounts which* the School District *may be required or permitted to pay* as indemnity to an Assured, *for a claim or claims made against an Assured for a Wrongful Act and shall include but not be limited to damages, judgments, settlements and costs,* cost of investigation and defense of legal actions . . .

*claims or proceedings* and appeals therefrom, costs
of attachment or similar bonds . . . .[1]

* * *

VII. Notice of Claim:

(a) *If the School District* or any Assureds *shall
receive written or oral notice from any party that
it is the intention of such party to hold the As-
sureds responsible for a Wrongful Act* which oc-
curred during the policy period, they shall give
written notice within one year to the Insurer of
the receipt of such written or oral notice, then *any
claim made* within the space of two years follow-
ing the termination of this policy . . . against the
Assureds arising out of such Wrongful Act *shall,
for the purpose of this policy, be treated as a claim
made* during the policy year in which the Wrong-
ful Act occurred.

* * *

(c) *The School District,* or the Assureds *shall,* as
a condition precedent to their rights under this
policy, *give the Insurer notice in writing of any
claim made* and shall give the Insurer such infor-
mation and cooperation as it may reasonably re-
quire. [Emphasis added.]

Courts must enforce the terms of an insurance
contract as written. Courts may not read into an
insurance policy an ambiguity that does not exist.
When the terms of a policy are plain and unam-
biguous, their plain meaning should be given ef-
fect. *Upjohn Co v New Hampshire Ins Co,* 438
Mich 197, 206-207; 476 NW2d 392 (1991).

This appeal presents an issue of first impression
for this Court: Whether a sex discrimination com-
plaint filed with the DCR or the EEOC constitutes a
"claim" within the meaning of an insurance policy

---

[1] This presentation of the pertinent insurance provisions is com-
piled from the original policy language and an addendum to that
policy entitled "Liberalization Endorsement."

that provides coverage where a wrongful act is discovered and a claim for indemnity is made within the policy period or two years after its termination. *Stine, supra.* Because defendant's insurance policy at issue does not define the term "claim," this term should be given its commonly used meaning, taking into account the reasonable expectations of the parties. Resort to dictionary definitions is helpful in this endeavor. *Michigan Millers Mutual Ins Co v Bronson Plating Co,* 445 Mich 558, 567-568; 519 NW2d 864 (1994). Although an insurance policy's failure to define a term does not render the term ambiguous, ambiguities that remain after determining a word's commonly used meaning should be construed favorably to the insured. *Id.*

In resolving whether Rutherford's 1981 complaint to the DCR alleging discrimination constituted a claim for a "wrongful act" within the meaning of defendant's policy, we must first ask whether "claim" is ambiguous in the context of the insurance policy. *Id.* at 567. Second, if "claim" is ambiguous and capable of a broad definition, we must determine whether it reasonably may be understood to encompass Rutherford's DCR complaint against plaintiff. *Id.*

Black's Law Dictionary (6th ed), p 247, defines the term "claim" as follows:

> To demand as one's own or as one's right; to assert; to urge; to insist. A cause of action. *Means by or through which claimant obtains possession or enjoyment of privilege or thing.* Demand for money or property as of right, e.g., insurance claim. [Emphasis added.]

The *Random House Webster's College Dictionary,* p 249, defines "claim" as follows:

> [A] demand[2] for something as due; as assertion
> of a right or an alleged right . . . an assertion of
> something as a fact . . . a right to claim or de-
> mand; a just title to something . . . a request or
> demand for payment in accordance with an insur-
> ance policy, a workers' compensation law, etc.

Michigan courts have also defined the word
"claim" as " 'a demand of a right or alleged right;
a calling on another for something due or asserted
to be due,' " *Central Wholesale Co v Chesapeake &
O R Co,* 366 Mich 138, 149; 114 NW2d 221 (1962),
quoting *Allen v Bd of State Auditors,* 122 Mich
324, 328; 81 NW 113 (1899), and "more than a
notice of loss; it must include a demand for pay-
ment of damages," *Dawlen Corp v New York
Central R Co,* 328 Mich 360, 362; 43 NW2d 887
(1950). Nonetheless, in *Continental Casualty Co v
Enco Associates, Inc,* 66 Mich App 46, 50-51; 238
NW2d 198 (1975), this Court refused to "split
hairs" over whether a telephone call constituted a
"demand for payment" or assertion of a right.
Instead, this Court held that when the construc-
tion company's architect told the insured that
structural faults had been discovered in a parking
ramp the insured had designed and that the in-
sured would be held responsible, "a 'claim' was
made in the ordinary sense of the word." *Id.* Any
subsequent correspondence reiterating the con-
struction company's intention did not alter the
status of the earlier claim for purposes of Conti-
nental's claims-made policy. *Id.* at 48-51.

These definitions of the word "claim" are unam-
biguous, they are consistent with the policy lan-
guage, and they certainly encompass complaints
filed with the DCR and the EEOC. In the case at bar,

---

2 The term "demand" is defined as "to ask for with proper author-
ity; claim as a right . . . to ask for peremptorily or urgently . . . to
call for or require as just, proper, or necessary." *Id.* at 359.

the trial court more narrowly defined "claim" as
"a demand for something due or believed to be
due," on the basis of *Webster's Ninth New Colle-
giate Dictionary* and the decision in *Bensalem Twp
v Western World Ins Co,* 609 F Supp 1343 (ED Pa,
1985). According to the trial court, the DCR charge
that Rutherford filed against plaintiff did not
make any demand for something due or believed
to be due; instead, "[i]t merely alleged gender
discrimination and gave notice that the charge
would be investigated by the Civil Rights Depart-
ment." In view of the broad policy language and
the common definition of "claim," such a narrow
interpretation is simply inaccurate and ignores the
ramification of these filings.

The recent case of *Michigan Millers Mutual Ins
Co, supra,* addressed an analogous issue and, there-
fore, is instructive. In *Michigan Millers,* our Su-
preme Court determined that a letter from the
Environmental Protection Agency notifying the
defendant of its *potential* liability for alleged envi-
ronmental contamination constituted a "suit" that
gave rise to the insurers' duties to defend under
the terms of the applicable insurance contracts. *Id.*
at 566. Like the trial court in the instant case, our
Supreme Court in *Michigan Millers* first went
through the exercise of deciding whether the term
"suit" was ambiguous, i.e., "whether the term may
refer to some legal action other than a court
proceeding initiated by a complaint." *Id.* at 567.
Then, after concluding that indeed it was ambigu-
ous, our Supreme Court went on to decide whether
"suit" reasonably could be understood to encom-
pass the receipt of a letter from the United States
Environmental Protection Agency informing the
defendant of its potential liability for a contami-
nated site. *Id.*

In its determination that the letter received by

the defendant could be construed as a "suit," i.e., that "a typical lay person might reasonably expect the term to apply to legal proceedings other than a court action initiated by a complaint" thereby triggering a duty to defend, the Supreme Court noted that the statutory scheme known as the CERCLA[3] allowed the EPA to conduct investigations, to perform removal or remedial actions, to assess costs, to require Bronson to submit documents regarding the site, and, ultimately, to take civil action and assess fines against the defendant. Therefore, the letter constituted the "functional equivalent of a suit brought in a court of law." *Id.* at 568-569, 572-573. Furthermore, the *Michigan Millers* Court noted that the EPA could create an administrative record that could play an important role in future litigation. *Id.* at 573.

Similarly, a person alleging that an employer is guilty of sex discrimination as prohibited by the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, does not file a DCR complaint merely to give the employer notice that discrimination is occurring or that an investigation will ensue. Rather, by filing the complaint, the employee is, whether explicitly or implicitly, (1) requesting that the employer end its discriminatory practices or face statutory penalties and (2) seeking the DCR's and the EEOC's assistance in order either (a) to be reinstated to the position held before the discrimination occurred or (b) to be compensated financially as a result of the employer's discriminatory practices or both. Indeed, the DCR is enabled statutorily to issue charges, hold hearings, correct past discriminatory practices, issue cease and desist orders, order the hiring, reinstatement, or upgrading of employees, *order*

[3] Comprehensive Environmental Response, Compensation and Liability Act, 42 USC 9601 *et seq.*

*payment of compensation for the discrimination
including back pay and reasonable attorney fees,*
and *order payment of civil fines.* MCL 37.2605;
MSA 3.548(605). All these proceedings and sanc-
tions are possible absent the filing of a formal civil
complaint, which defendant implies is necessary in
order for Rutherford's discrimination allegations
to constitute a claim under its policy.[4] Moreover,
allegations of sex discrimination and civil rights
violations are often first brought to the DCR and
must be brought to the EEOC if the claim involves
federal violations; thus, such "claims" usually will
be addressed first in a non-court forum.

In light of the practical import of filing a DCR
complaint and the potential ramifications of such a
complaint, we believe that the trial court "split
hairs" and incorrectly concluded that Rutherford's
DCR complaint against plaintiff did not constitute a
"claim" because it did not expressly declare that
Rutherford "demanded" reinstatement or money
damages. Such demands are, indeed, implicit.
These demands are the obvious reason for the very
filing of the DCR complaint, and, in the instant
case, they resulted in the award of money to
Rutherford. See *Continental Casualty, supra,* 66
Mich App 50-51. Consequently, we do not agree
with the dissent or the trial court that the DCR
charge is only a notice of Rutherford's intent to
hold plaintiff liable. *Bensalem Twp, supra* at 1348.[5]

---

[4] Compare *Michigan Millers, supra* at 574:

> The significant authority given to the EPA in such matters
> allows it essentially to usurp the traditional role of a court of
> law in determining and apportioning liability. Such matters are
> concluded *by the EPA* before the action is ever brought to court.
> [Emphasis in original.]

[5] We believe that the court's discussion and conclusion in *Bensalem
Twp* that the EEOC complaint was merely a notice of an employee's
intent to hold the insured responsible for a wrongful act constituted

Where, as here, this Court must interpret an undefined term according to its commonly used meaning, taking into account the reasonable expectations of the parties, we will not adopt the trial court's restrictive, narrow definition of "claim," which is clearly contrary to the broad policy language, the common definition, and plaintiff's reasonable expectations. *Michigan Millers, supra* at 567, 569.

Finally, defendant's own actions support the conclusion that, originally, defendant considered the allegations in the DCR and the EEOC complaints as possible wrongful acts giving rise to a compensable claim—a claim as contemplated by both parties. Both plaintiff and defendant understood that Rutherford's filing of charges of discrimination with the DCR and the EEOC was essentially the beginning point of a claim against plaintiff, and for that reason, plaintiff immediately notified defendant of Rutherford's charges. Both parties originally believed that the claim was covered under defendant's policy. Moreover, both parties certainly knew that the EEOC complaint was the sole way to initiate a federal claim of employment discrimination, i.e., Rutherford had no right to file a lawsuit before raising the claim with the EEOC and obtaining a right-to-sue letter. 42 USC 2000e-5.

In acknowledging receipt of the charge of dis-

dicta. See, e.g., *People v Green,* 205 Mich App 342, 346; 517 NW2d 782 (1994). After engaging in a lengthy dissertation about this topic, the court opined that it was "unnecessary for me to determine precisely when a 'claim' was 'first made' in this case." *Bensalem Twp, supra* at 1349. Rather, the court decided that after the plaintiff received the EEOC complaint, "all communications between plaintiff and the EEOC, as well as the filing of the [federal court] complaint [pursuant to an EEOC right-to-sue letter] *took place during the period covered by the policy." Id.* (Emphasis added.) Thus, the dissent relies on statements in *Bensalem Twp* that were not essential to the determination of the material issue and therefore carry no precedential or instructive weight. *Green, supra.*

crimination before April 1, 1982, defendant responded to plaintiff by letter. Defendant not only advised plaintiff that it had established a claim number for Rutherford's DCR complaint, it went on to state: "[B]ased on the information we have received thus far, we do not foresee any coverage problems." Then, approximately one year later, defendant requested plaintiff to provide information regarding the status of the "claim." Certainly defendant's acknowledgment and follow-up letters evidence the reasonable expectation of both parties that the allegation of sexual discrimination was, in fact, a covered claim that triggered insurance coverage. Importantly, when defendant finally denied coverage on July 16, 1990, it did so because it believed Rutherford's *award* of lost wages was *excluded* under the policy, not because it believed an untimely or improper claim had been made. Moreover, the same letter expressly stated, "however, there is coverage for indemnification for defense costs incurred." Certainly these communications are most reflective of defendant's state of mind and undermine the rationale for the trial court's conclusions.

On appeal, defendant also argues that even if a timely claim were filed, it is excluded under paragraph IV(b)(6) of the Liberalization Endorsement, which provides in relevant part: "[T]he insurer shall not be liable to make any payments for loss in connection with any claim made against the Assureds for any amounts due under terms of any contractual obligation." Defendant's argument that there is no coverage because plaintiff's payment to Rutherford was a loss arising from the breach of a contractual obligation is without merit. Although Rutherford stated in his charges of discrimination with the DCR and the EEOC that "he was unfairly denied a contractually provided

bumping right" under the collective bargaining agreement, clearly the gravamen of the charge was sex discrimination. The DCR found that plaintiff had engaged in prohibited sex discrimination. An exclusion of liability insurance coverage for contractually assured obligations to third parties is operative only where the insured would not have been liable to the third party absent the insured's agreement to pay. *Royal Oak School Dist v Continental Casualty Co,* 912 F2d 844, 847 (CA 6, 1990).

Additionally, although the issue of equitable estoppel was not fully raised or addressed in the trial court and it is not necessary for proper determination of this case, *Swartz v Dow Chemical Co,* 414 Mich 433; 326 NW2d 804 (1982), the evidence in the record regarding that issue is also relevant to show the parties' reasonable expectations. Again, defendant's letters and conduct as previously described led plaintiff justifiably to believe that a claim under the policy had been made and that insurance coverage both for its defense and the loss was available. As a practical matter, had plaintiff not so believed, it certainly would have maintained the policy instead of allowing it to lapse; that is, had plaintiff known that defendant would not consider Rutherford's claims with the DCR and EEOC as "claims" under the insurance policy *until* the DCR either decided the matter or the EEOC issued a "right-to-sue" letter, it likely would have continued the policy in effect until such time as the matter was resolved. Allowing defendant to deny that the concurrent DCR and EEOC filings constituted a claim severely prejudiced plaintiff, because it has already paid all its premiums, its defense costs, and the award made by the DCR to Rutherford. Here, the record contains evidence of the essential elements of estoppel. This same evidence simultaneously reflects the parties'

reasonable expectations concerning the insurance coverage issue. See *Industro Motive Corp v Morris Agency, Inc,* 76 Mich App 390, 395; 256 NW2d 607 (1977).

Accordingly, we find that the trial court erred in granting defendant's motion for summary disposition pursuant to MCR 2.116(C)(10), because plaintiff properly submitted Rutherford's discrimination claim to defendant during the period when defendant's claims-made policy was in effect and the policy appears to cover both the claim and the costs of defense. Thus, genuine issues of material fact exist, and defendant is not entitled to judgment as a matter of law. *Michigan Mutual, supra.* We, therefore, reverse the order of the trial court and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

Reversed and remanded.

HOLBROOK, JR., J., concurred.

CAVANAGH, P.J. *(dissenting).* I respectfully dissent. Defendant's policy provided coverage only for claims made "during the policy period." Thus, the policy is a "claims-made" policy. In general, a claims-made policy provides coverage no matter when the alleged error, omission, or act of negligence occurred, as long as the misdeed is discovered and the claim for indemnity is made within the policy period. *Stine v Continental Casualty Co,* 419 Mich 89, 97; 349 NW2d 127 (1984). The issue presented therefore is whether Rutherford's allegation of discrimination in 1981 constituted a claim for a wrongful act within the meaning of defendant's policy.

Defendant's insurance policy does not define the word "claim." However, that fact alone is not conclusive evidence of the existence of an ambigu-

ity. A term that is undefined in an insurance policy should be given its commonly used meaning. *Group Ins Co of Michigan v Czopek,* 440 Mich 590, 596; 489 NW2d 444 (1992).

The Supreme Court has defined "claim" as " 'a demand of a right or alleged right; a calling on another for something due or asserted to be due.' " *Central Wholesale Co v Chesapeake & O R Co,* 366 Mich 138, 149; 114 NW2d 221 (1962), quoting *Allen v Bd of State Auditors,* 122 Mich 324, 328; 81 NW 113 (1899). The Court further stated that the very essence of a claim is "a demand for payment, formal or informal." *Central Wholesale, supra* at 150.

A review of the case law of other jurisdictions indicates that, for the purpose of determining coverage under a claims-made policy, a "claim" is defined as "a demand for something as a right" or "a demand for payment of some amount of money." See, e.g., *MGIC Indemnity Corp v Home State Savings Ass'n,* 797 F2d 285, 287 (CA 6, 1986); *Ins Corp of America v Dillon, Hardamon & Cohen,* 725 F Supp 1461, 1468 (ND Ind, 1988); *Mt Hawley Ins Co v Federal Savings & Loan Ins Corp,* 695 F Supp 469, 479 (CD Cal, 1987); *Bensalem Twp v Western World Ins Co,* 609 F Supp 1343, 1348 (ED Pa, 1985); *Safeco Title Ins Co v Gannon,* 54 Wash App 330, 334-335; 774 P2d 30 (1989).

In reaching its decision, the trial court relied on *Bensalem Twp, supra.* The facts of *Bensalem Twp* are similar to the present case, but the insurer and its insured were aligned on the opposite sides. The Equal Employment Opportunity Commission (EEOC) notified the township of the claimant's charge of age discrimination before the claims-made policy took effect, but did not file a lawsuit until after the policy was in force. The insurer argued that the claim was first made when the

township was notified that the claimant had filed a charge with the EEOC. *Bensalem Twp, supra* at 1344-1346.

The *Bensalem Twp* court held that the initial letter notifying the township of the claimant's charge of age discrimination did not constitute a claim. The court noted that case law generally supports the proposition that, for purposes of determining coverage under a claims-made policy, a "claim" is "a demand for something as a right." *Id.* at 1348. The court then reasoned that the letter merely notified the township of the charge and the EEOC's intent to attempt to resolve the matter informally. While the letter informed the township that a demand for relief, based on a legal right, might ensue, neither the letter nor the initial claim purported to be such a demand. *Id.*

The majority concludes that the *Bensalem Twp* court's conclusion that the EEOC complaint was merely a notice of the employee's intent to hold the insurer responsible for a wrongful act constituted dicta. However, whether the court's discussion constituted dicta is immaterial in this case because this Court is not bound to follow the decision of a federal court in Pennsylvania. In addition, a court is not prohibited from finding the dicta of another court to be persuasive. See, e.g., *Eyde Bros Development Co v Eaton Co Drain Comm'r,* 427 Mich 271, 286; 398 NW2d 297 (1986); *Dykstra v Dep't of Transportation,* 208 Mich App 390, 392; 528 NW2d 754 (1995). The proper question is whether the reasoning of the dicta is sound.

In fact, other courts have adopted the reasoning in *Bensalem Twp* and held that notification of a potential liability does not constitute a claim. See *Winkler v Nat'l Union Fire Ins Co of Pittsburgh,* 930 F2d 1364, 1366-1367 (CA 9, 1991); *Ins Corp of America v Dillon, Hardamon & Cohen, supra* at

1470; *Gibraltar Casualty Co v A Epstein & Sons Int'l, Inc,* 206 Ill App 3d 272, 279-280; 150 Ill Dec 236; 562 NE2d 1039 (1990); *Kenefick v Hitchcock,* 187 Wis App 2d 218; 522 NW2d 261 (1994). As the court in *Ins Corp of America, supra* at 1470, explained:

> Simply becoming aware of an alleged injury is not enough to amount to a claim. Awareness is not a demand and the use of the word claim, unless modified by other language, requires that a demand be made.

Defendant's policy contains the following language:

VII. Notice of Claim

(a) If the School District or any Assureds shall receive written or oral notice from any party that it is the intention of such party to hold the Assureds responsible for a Wrongful Act which occurred during the policy period, they shall give written notice within one year to the Insurer of the receipt of such written or oral notice, then any claim made within the space of two years following the termination of this policy . . . shall, for the purposes of this policy, be treated as a claim made during the policy year in which the Wrongful Act occurred.

\*    \*    \*

(c) The School District, or the Assureds shall, as a condition precedent to their rights under this policy, give the Insurer notice in writing of any claim made and shall give the Insurer such information and cooperation as it may reasonably require.

Thus, the policy appears to distinguish between a "claim" and "notice from any party that it is the intention of such party to hold the Assureds re-

sponsible for a Wrongful Act." An insurance contract should be read as a whole and meaning given to all terms. *Auto-Owners Ins Co v Churchman,* 440 Mich 560, 566; 489 NW2d 431 (1992). The contractual language is to be given its ordinary and plain meaning, and technical and strained constructions should be avoided. *Hawkeye-Security Ins Co v Vector Construction Co,* 185 Mich App 369, 380-381; 460 NW2d 329 (1990).

The majority asserts that Rutherford sought relief pursuant to the Civil Rights Act through his complaint filed with the Department of Civil Rights (DCR). The majority reasons that because the DCR had the authority to award damages to Rutherford in the event that he prevailed, Rutherford's charge of discrimination constitutes a "claim" against plaintiff.

However, the notice sent by the DCR to plaintiff in April 1982 merely informed plaintiff that it intended to investigate Rutherford's allegation of sex discrimination and requested plaintiff's cooperation in that investigation. I would find that Rutherford's charge of discrimination was not an actual claim, but rather notice of an alleged injury from which a claim could subsequently arise. An actual claim is distinguished from an "event" that could give rise to an actual claim in the future. *Employers Ins of Wausau v Bodi-Wachs Aviation Ins Agency, Inc,* 39 F3d 138, 143 (CA 7, 1994).

Under paragraph VII(a) of defendant's policy, plaintiff had three years following the termination of the policy to make the actual claim. It is undisputed that the policy expired on April 1, 1982, and that the actual claim, that is, a demand for something due as a right, was not made until May 10, 1989, when the DCR filed a formal complaint against plaintiff. Because the claim was not made within three years of the termination of the policy,

I would conclude that plaintiff is not covered under defendant's policy.

The majority relies on *Continental Casualty Co v Enco Associates, Inc,* 66 Mich App 46; 238 NW2d 198 (1975), for the proposition that this Court should not "split hairs" when determining whether the insured had submitted a claim. However, the majority misapplies *Enco* to the facts of this case. *Enco* merely stands for the proposition that oral notice of an insured's liability for a defect during the policy period is sufficient to constitute a claim. *Id.* at 51. There was no question in *Enco* that the insured was making a demand for payment in his telephone call.

I am aware that the Supreme Court recently held that a letter from the Environmental Protection Agency to an insured that it was potentially liable for environmental contamination constituted the initiation of a "suit" under the terms of the insurance policy at issue, thus triggering the insurer's duty to defend. *Michigan Millers Mutual Ins Co v Bronson Plating Co,* 445 Mich 558, 575; 519 NW2d 864 (1994). However, *Bronson* was decided within the particular context of environmental litigation. Moreover, it is well-settled that an insurer's duty to defend is broader than its duty to indemnify. *Auto-Owners Ins Co v City of Clare,* 446 Mich 1, 15; 521 NW2d 480 (1994); *Allstate Ins Co v Freeman,* 432 Mich 656, 662; 443 NW2d 734 (1989) (RILEY, J.). I would therefore decline to reach an analogous result.