ASSEMANY v ARCHDIOCESE OF DETROIT

Docket No. 99252. Submitted October 3, 1988, at Detroit. Decided December 20, 1988.

In 1968, George P. Assemany accepted a position as musical director for Gesu Parish, a Roman Catholic church within the ecclesiastical jurisdiction of the Archdiocese of Detroit. Assemany entered into three-year contracts of employment with Gesu, the last of which covered the period from 1977 to 1980. In 1980, a new pastor took over Gesu Parish and was critical of Assemany's performance as musical director. Assemany accepted a one-year contract as musical director that year. The new pastor, Father Serrick, still critical of Assemany's performance, informed Assemany that his contract would not be renewed thereafter. The church council and the choir opposed Father Serrick's decision, and Assemany's contract was again renewed for a one-year period beginning September 27, 1981, this time giving Assemany the title of pastoral musician. Assemany was relieved of his responsibilities to teach music to children in the Gesu school and to direct the children's choir. He was placed in charge of the liturgical music of the parish and its performance. He was also to develop a cantor program at Gesu. Assemany's salary was reduced and both parties had the unrestricted right to terminate the agreement at will upon sixty days written notice. Simultaneously, Gesu hired a younger man to teach music to Gesu's students, direct the children's choir, and play music for the daily mass. That man resigned in February, 1982, and Assemany requested that he be allowed to resume those responsibilities for an increase in salary. The request was denied and another man was hired for the position of worship coordinator and to work with the school children. In August, 1982, Assemany filed a discrimination charge against Gesu Parish with the Michigan Department of Civil Rights. Gesu and Assemany subsequently entered into another one-year contract similar to the existing one. In February, 1983, the

REFERENCES

Am Jur 2d, Constitutional Law §§ 464 *et seq.*; Religious Societies §§ 22 *et seq.*, 35.

Judicial review of termination of pastor's employment by local church or temple. 31 ALR4th 851.

Department of Civil Rights proposed a settlement of the discrimination charge and Assemany eventually withdrew the charge. In a letter dated September 30, 1983, Assemany was informed that his employment would not be continued beyond the expiration of the 1982-83 contract. Gesu appointed the younger man as its pastoral musician after Assemany's departure and he was ultimately given the position of music director. Assemany filed suit against the Archdiocese of Detroit, Gesu Parish, and Father Serrick in Wayne Circuit Court alleging that defendants violated his rights under the Civil Rights Act. The court, William Leo Cahalan, J., granted summary disposition in favor of defendants, finding that plaintiff's claims were barred by application of the Free Exercise Clause of the First Amendment. Plaintiff appealed.

The Court of Appeals *held:*

The Free Exercise Clause precludes judicial review of decisions by religious bodies concerning discipline or employment of ministers. This ministerial exception does not depend on ordination, but on the function of the individual's position. While employed at Gesu, plaintiff was the head of the musical branch of the Catholic liturgy and was intimately involved in the propagation of Catholic doctrine and the observance and conduct of Catholic liturgy by the Gesu congregation. Plaintiff could properly be considered to be a member of the clergy on the basis of the function of his position and his discrimination claim is therefore barred by the Free Exercise Clause of the First Amendment. Plaintiff failed to establish the existence of a dispute concerning an issue of material fact as to his role at Gesu Parish. Summary disposition was properly granted.

Affirmed.

1. CONSTITUTIONAL LAW — FREEDOM OF RELIGION — FREE EXERCISE CLAUSE — DECISIONS BY RELIGIOUS BODIES — JUDICIAL REVIEW.

The Free Exercise Clause of the First Amendment precludes judicial review of decisions by religious bodies concerning discipline or employment of ministers; civil courts are bound to accept the decisions of the highest judicatories of a religious organization on matters of discipline, faith, internal organization or ecclesiastical rule, custom, or law (US Const, Am I).

2. RELIGIOUS CORPORATIONS AND ASSOCIATIONS — CHURCH EMPLOYEES — CLERGY.

A church employee whose primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision of or participation in religious ritual and worship should be considered a member of the clergy.

*Susan Winshall & Associates, P.C.* (by *Cathy E. Radner*), for plaintiff.

*Bodman, Longley & Dahling* (by *Joseph A. Sullivan, Karen L. Piper* and *Kim Michael Lavalle*), for defendants.

Before: DOCTOROFF, P.J., and SHEPHERD and R. R. LAMB,* JJ.

DOCTOROFF, P.J. Plaintiff appeals as of right from an order granting defendants' motion for summary disposition and denying plaintiff's cross-motion for summary disposition. MCR 2.116(C)(10). The trial court held that plaintiff's claims under the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, were barred by application of the Free Exercise Clause of the First Amendment. We affirm.

Defendant Gesu is a Roman Catholic church lying within the ecclesiastical jurisdiction of the Archdiocese of Detroit. Plaintiff is a sixty-one-year-old white male. In 1945, he graduated from Palestrina Institute of Ecclesiastical Music, a school operated by the archdiocese to train organists. Plaintiff worked for several Catholic parishes in the Detroit area as an organist.

In 1968, the then-pastor of Gesu, Father Swarcz, offered plaintiff a position as Gesu's musical director. Plaintiff stated that he was given oral assurance of lifetime employment as long as he did his job properly. Although plaintiff testified that a contract was signed when he first began employment with Gesu, the earliest contract on record covers the period from July 1, 1974, to 1977. It outlined plaintiff's responsibilities as musical director. The contract provided, in part:

---

* Circuit judge, sitting on the Court of Appeals by assignment.

> The Music Director will be, in conjunction with the Parish Worship Committee, completely responsible for all liturgical music in the parish, and all music connected with paraliturgical services, such as bible vigils, vespers, penance services, etc.

In addition, in collaboration with the worship committee, plaintiff was to select, prepare, and teach suitable and appropriate music to the congregation, prepare music fitting to the theme of each Sunday and holy day liturgy, provide music for the daily masses, select music for and direct the parish choir, aid in the musical participation of Gesu students in their liturgies, assist with and participate in liturgies or musical events on a vicariate level and provide music for weddings and funerals. He was required to be present fifteen minutes in advance of any liturgy or parish activity in which he was to participate. Plaintiff's salary was $11,375, plus separate remuneration for providing organ music at weddings.

When the 1974-77 contract expired, plaintiff and Gesu entered into another three-year contract in which plaintiff was again employed as Gesu's musical director. His salary was increased to $12,853.75. His duties were identical to those under the 1974-77 contract. In addition, plaintiff assumed the duties of teaching the school children at Gesu to participate in daily mass and conducting a children's choir. Plaintiff stated that he handled all of the musical functions for the parish liturgies.

Father James Serrick became associate pastor of Gesu in 1977. In 1980, he became its pastor. Unlike Gesu's former pastors, Father Serrick was a vocal critic of plaintiff. In 1978, Father Serrick outlined his criticisms of plaintiff in a four-page letter to plaintiff. In that letter, Father Serrick

criticized plaintiff's playing ability ("less than mediocre"), his failure to arrive at church fifteen minutes before church services, his failure to attend worship committee meetings at which, according to Father Serrick, plaintiff should be a "key person," his "imposing" (rather than "invitational") playing style, and his failure to effectively lead the congregation during church services. Father Serrick suggested that plaintiff attend workshops on organ techniques or take lessons. Father Serrick was also critical of plaintiff's performance in leading the parish choir:

> Then there is the matter of the "performing" or the "ministerial" choir. I fully realize that a choir has to be challenged musically. But I think our choir needs help and insight so that the members see themselves as having a significant liturgical (rather than performing) role. They need greater leadership in the area of establishing a prayerful atmosphere so that, more and more, they inspire and lead the prayer of the congregation when appropriate.

In 1980, plaintiff signed a one-year contract as Gesu's music director, beginning July 1, 1980. The contract specified certain areas which needed improvement. Plaintiff was expected to exercise "pastoral-liturgical leadership" of the choir. He was required to take music lessons and attend workshops to improve his playing ability. He was to develop a program to prepare the children to sing at the Saturday afternoon and early Sunday services. The remaining responsibilities were essentially unchanged from the earlier contracts.

Father Serrick's dissatisfaction with plaintiff continued and, on January 28, 1981, Father Serrick informed plaintiff that his contract would not be renewed. Plaintiff alleged that, at a meeting

between Father Serrick and the choir, Father Serrick stated that Gesu needed a younger and black organist. Plaintiff testified that Father Serrick personally told plaintiff that he was too old for the job and that Gesu was becoming a black parish and it was time it had a black organist.

Father Serrick notified the parish council and choir of his decision by letter on January 29, 1981. The council and choir opposed Father Serrick's decision. Thus, plaintiff's contract was renewed for a one-year period which began on September 27, 1981.

The 1981-82 contract represented a significant change in plaintiff's job duties. Plaintiff was given the new title of pastoral musician. The contract incorporated a job description for that position. Plaintiff was relieved of his responsibilities to teach music to children in the Gesu school and to direct the children's choir. He was in charge of the liturgical music of the parish and its performance. In addition, plaintiff was to develop a cantor program at Gesu in accordance with the guidelines of the archdiocesan program for cantors. Plaintiff's salary was reduced to $10,000 with certain fringe benefits. Both parties had the unrestricted right to terminate the agreement at will upon sixty days notice in writing. The contract contained an integration clause wherein it was agreed that this contract superseded any and all prior employment agreements and understandings between the parties.

Gesu simultaneously hired a younger white man to teach music to Gesu students, direct the children's choir and play music for the daily mass. When that teacher resigned in February, 1982, plaintiff requested that he be permitted to resume these responsibilities for an increase in salary. Instead, in May, 1982, Gesu hired Carl Clenden-

ning, a twenty-eight-year-old black male, for the position of worship coordinator and to work with the school children.

In August, 1982, plaintiff filed a discrimination charge against Gesu with the Michigan Department of Civil Rights. While this was pending, Gesu and plaintiff negotiated a contract for the period from December 1, 1982, to November 30, 1983, similar to the 1981-82 contract.

In February, 1983, the Michigan Department of Civil Rights proposed a settlement of plaintiff's discrimination charge. Gesu would renegotiate plaintiff's 1982-83 contract and plaintiff would drop the charges against Gesu. Plaintiff withdrew the charge but the contract was not renegotiated.

In a letter dated September 30, 1983, plaintiff was informed that his employment would not be continued beyond the expiration of the 1982-83 contract. Gesu appointed Clendenning as its pastoral musician after plaintiff's departure. Clendenning was ultimately given the position of music director.

On appeal, plaintiff argues that the trial court erred in granting summary disposition because a factual dispute existed as to whether plaintiff should be classified as a secular (layman) or nonsecular (religious) employee. Thus, the trial court improperly engaged in fact-finding. We disagree.

The standard for deciding a motion under MCR 2.116(C)(10) is well established. The court must first review all the evidence presented, including any depositions, affidavits, admissions, and pleadings, and then ascertain whether there is any dispute as to a material fact. *Omega Construction Co, Inc v Altman,* 147 Mich App 649, 652; 382 NW2d 839 (1985). The test is whether the record which might be developed, giving the benefit of any reasonable doubt to the nonmoving party,

would leave open an issue upon which reasonable minds might differ. *Rizzo v Kretschmer,* 389 Mich 363, 371-373; 207 NW2d 316 (1973). The court should be liberal in finding a question of material fact and must carefully avoid making findings of fact under the guise of determining that no issues of material fact exist. *Partrich v Muscat,* 84 Mich App 724, 730-731; 270 NW2d 506 (1978). If in granting summary disposition the court makes findings of fact, the appellate court must reverse, but the lower court decision will be affirmed where no factual development could justify recovery by the nonmoving party. *Jubenville v West End Cartage Co,* 163 Mich App 199, 203; 413 NW2d 705 (1987), lv den 429 Mich 881 (1987).

The First Amendment of the United States Constitution provides, in part, that Congress shall make no law prohibiting the free exercise of religion. US Const, Am I. The prohibitions contained in the First Amendment apply to the states through the Fourteenth Amendment. *Cantwell v Connecticut,* 310 US 296, 303; 60 S Ct 900; 84 L Ed 1213 (1940). The Free Exercise Clause constitutes an absolute prohibition against governmental regulation of religious beliefs. *Wisconsin v Yoder,* 406 US 205, 219; 92 S Ct 1526; 32 L Ed 2d 15 (1972); *Sherbert v Verner,* 374 US 398, 402; 83 S Ct 1790; 10 L Ed 2d 965 (1963). Nevertheless, governmental regulation may lawfully impose an incidental burden on otherwise protected religious conduct. *McLeod v Providence Christian School,* 160 Mich App 333, 343; 408 NW2d 146 (1987). Religious organizations are not absolutely free from governmental interference where there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause. Only those governmental interests of the highest order and those not otherwise served can overba-

lance legitimate claims to the free exercise of religion. *Yoder, supra,* 406 US at 214-215.

In *Borgman v Bultema,* 213 Mich 684, 703; 182 NW 91 (1921), our Supreme Court, citing *Morris Street Baptist Church v Dart,* 67 SC 338; 45 SE 753; 100 Am St Rep 727 (1903), held:

> "The civil courts will not enter into a consideration of church doctrine or church discipline, nor will they inquire into the regularity of the proceedings of the church judicatories having cognizance of such matters. To assume such jurisdiction would not only be an attempt by the civil courts to deal with matters of which they have no special knowledge, but it would be inconsistent with complete religious liberty untrammeled by State authority. On this principle the action of the church authorities in the deposition of pastors and the expulsion of members is final."

*McClure v Salvation Army,* 460 F2d 553, 560-561 (CA 5, 1972), involved a discrimination suit between a church and its ministers under Title VII of the Civil Rights Act of 1964 (42 USC 2000e *et seq.)* Restricting its decision to the church-minister relationship, the *McClure* Court held that the Free Exercise Clause precludes judicial review of decisions by religious bodies concerning discipline or employment of ministers. Civil courts are bound to accept the decisions of the highest judicatories of a religious organization on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. *The Serbian Eastern Orthodox Diocese for the United States of America & Canada v Milivojevich,* 426 US 696, 713; 96 S Ct 2372; 49 L Ed 2d 151 (1976), reh den 429 US 873; 97 S Ct 191; 50 L Ed 2d 155 (1976).

In *Rayburn v General Conference of Seventh-Day Adventists,* 772 F2d 1164, 1168 (CA 4, 1985),

the Court held that the "ministerial exception" to Title VII as first articulated in *McClure, supra,* does not depend upon ordination "but upon the function of the position." Citing *EEOC v Southwestern Baptist Theological Seminary,* 651 F2d 277, 283 (CA 5, 1981), cert den 456 US 905; 102 S Ct 1749; 72 L Ed 2d 161 (1982), the *Rayburn* Court held:

> "As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy.' . . . This approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church." [*Rayburn,* p 1169. Citation omitted.]

The First Amendment protects the act of a decision rather than the motivation behind it. *Id.*

Courts have also held that employment decisions by religious bodies regarding lay teachers in church-run schools whose duties include teaching religion directly or indirectly are protected by the Free Exercise Clause from claims under Title VII. *EEOC v Southwestern Baptist, supra* (seminary instructors not entitled to Title VII coverage); *Maguire v Marquette University,* 627 F Supp 1499 (ED Wis, 1986) (Title VII sex discrimination suit by plaintiff denied employment as associate professor of theology barred by First Amendment); *Miller v Catholic Diocese of Great Falls,* 728 P2d 794 (Mont, 1986) (plaintiff's suit for breach of the covenant of good faith and fair dealing in employment following her discharge for failure to maintain discipline in the classroom barred by the Free Exercise of Religion Clause of the United States and Montana constitutions).

In *Walker v First Orthodox Presbyterian Church of San Francisco,* 22 Fair Empl Prac Cases 762 (Cal Super, 1980), the plaintiff was discharged from his position as defendant's organist because he was an "unrepentant homosexual." He sued to enforce a San Francisco ordinance forbidding employers from discriminating on the basis of sexual orientation. The defendant regarded its organist to be a member of its "worship team."

The *Walker* Court found that the combination of two factors, i.e., the defendant's religious belief in the biblical proscription that homosexuality is a sin for which one must repent and the fact that the church regarded its church organist as a member of the worship team, compelled termination of the plaintiff's employment. The court may not question the veracity of a religious belief, but must defer to the church in matters of ecclesiastical decisions. Applying the city ordinance to the defendant would have infringed too greatly on its First Amendment rights. *Id.,* pp 763-764.

In cases involving church employees who are not involved in the propagation of religious faith or religious doctrine, courts have held that Title VII actions against religious employers are not barred by the Free Exercise Clause notwithstanding the employers' arguments that their employment decisions were founded on religious beliefs. *Southwestern Baptist, supra* (support and administrative staff of seminary covered by Title VII); *EEOC v Pacific Press Publishing Ass'n,* 676 F2d 1272 (CA 9, 1982) (editorial secretary for nonprofit publisher of religious books); *EEOC v Mississippi College,* 626 F2d 477 (CA 5, 1980) (assistant professor of psychology at private college owned and operated by the Mississippi Baptist Convention); *EEOC v Fremont Christian School,* 781 F2d 1362 (CA 9,

1986), and *McLeod, supra* (lay teacher at private school owned and operated by church).

In the present case, plaintiff contends that he was merely the organist at Gesu, a secular employee who supported defendants' religious activities but did not engage in the propagation of religious doctrine or faith. We find that plaintiff's characterization of his function at Gesu is oversimplified.

Plaintiff was required to have a working knowledge of the Catholic religion and liturgy. He was responsible for the selection and teaching of all liturgical music in the parish. His primary responsibility was to enable and encourage the Gesu choir and congregation to participate in the Catholic liturgy through song. Plaintiff assumed a pastoral-liturgical leadership role in the parish.

On the basis of the facts of this case, we conclude that, while employed at Gesu, plaintiff was more than just an organist. He was the head of the musical branch of the Catholic liturgy there. Plaintiff was intimately involved in the propagation of Catholic doctrine and the observance and conduct of Catholic liturgy by the Gesu congregation. On the basis of "the function of his position," plaintiff was, thus, "clergy" as defined in *Rayburn, supra.* His Title VII discrimination claim is therefore barred by the Free Exercise Clause of the First Amendment of the United States Constitution.

We hold that plaintiff failed to establish the existence of a dispute concerning an issue of material fact as to his role at Gesu Parish. The trial court did not engage in fact finding when it held that plaintiff performed a nonsecular function at Gesu. Defendants' motion for summary disposition was properly granted.

Affirmed.