SMITH v CALVARY CHRISTIAN CHURCH

Docket No. 204661. Submitted June 9, 1998, at Lansing. Decided December 4, 1998, at 9:20 A.M. Leave to appeal sought.

David O. Smith brought an action in the Oakland Circuit Court against Calvary Christian Church and Mark Byers, pastor of the church, alleging intentional breach of confidentiality on the basis that Byers told the congregation that the plaintiff had confessed to him certain marital infidelities. The court, Steven N. Andrews, J., granted the defendants' motions for summary disposition, finding that MCL 600.2156; MSA 27A.2156 did not create a cause of action for disclosure of the confession and that the parties did not enter into an express agreement regarding the confidentiality of the confessions and, thus, holding that the plaintiff could not prove a breach of contract to keep the communication confidential. The court also found that the question whether the church required the pastor to keep the disclosure confidential was a matter of religious doctrine that the court could not determine according to civil law principles. Therefore, even if properly pleaded, the plaintiff could not and had not set forth prima facie causes of action for any form of intentional tort. The plaintiff appealed only with regard to the claims pertaining to intentional torts.

The Court of Appeals held:

1. A court ceases to have jurisdiction when it faces issues requiring the application of religious doctrine or ecclesiastical polity. Here, the manner in which the defendants decide to discipline the members of the church and the religious doctrine that underlies the discipline are matters of ecclesiastical polity.

2. Disciplinary practices involving members of an ecclesiastical association that do not pose a substantial threat to public safety, peace, or order are unquestionably among the First Amendment rights with which the government cannot interfere. The pastor's announcement to the congregation did not constitute a threat to public safety, peace, or order that would justify state interference.

3. There is a genuine issue of material fact whether the plaintiff had left the church congregation and was not a member of the church when his confession was disclosed. An examination of Byers' discipline of the plaintiff is precluded only if the plaintiff

was a member. The court erred in granting summary disposition with regard to the tort claims.

4. The orders granting summary disposition must be affirmed with respect to the breach of contract and statutory claims and reversed with respect to the intentional tort claims. The matter must be remanded for further proceedings.

Affirmed in part, reversed in part, and remanded.

O'CONNELL, J., dissenting, stated that the orders of summary disposition should be affirmed in their entirety. The question whether the plaintiff was a member of the church at the time of the disclosure has no bearing on the resolution of this case because there is no dispute that the dissension between the plaintiff and the defendants arose from events that occurred while the plaintiff was a member of the church. The First Amendment provides ecclesiastical organizations with a shield covering all disciplinary practices involving their members that do not pose a substantial threat to public safety, peace, or order. If church doctrine authorizes a sanction, the constitutional shield should remain in place even if the subject of the discipline has ceased to be a member, if the actions relate to church doctrine. Because this dispute involves church doctrine, the disciplinary measure at issue is protected under the Free Exercise Clause of the First Amendment, even if it was imposed after the plaintiff severed his membership. The Court of Appeals has no jurisdiction to resolve this dispute.

1. CONSTITUTIONAL LAW — RELIGIOUS CORPORATIONS AND ASSOCIATIONS — FREEDOM OF RELIGION.

The Free Exercise Clause of the First Amendment prohibits government regulation of religious beliefs; the government, however, may impose an incidental burden on otherwise protected conduct where necessary to protect important societal interests, such as where a state interest of significant magnitude exists to override the interest allegedly protected under the Free Exercise Clause (US Const, Am I).

2. CONSTITUTIONAL LAW — RELIGIOUS CORPORATIONS AND ASSOCIATIONS — COURTS — JURISDICTION.

Both federal and state courts are severely restricted in resolving disputes between a church and its members absent conduct that negatively affects the public interest in public safety, peace, or order; jurisdiction over these matters is limited to determining property rights that can be resolved by the application of civil law; courts do not have jurisdiction to resolve issues requiring the application of religious doctrine or ecclesiastical polity (US Const, Ams I, XIV; Const 1963, art 1, § 4).

3. CONSTITUTIONAL LAW — RELIGIOUS CORPORATIONS AND ASSOCIATIONS — DISCI-
   PLINARY PRACTICES — GOVERNMENTAL REGULATION.

   The First Amendment prevents government interference with discipli-
   nary practices involving members of an ecclesiastical association
   where the disciplinary practices do not pose a substantial threat to
   public safety, peace, or order (US Const, Am I).

4. CONSTITUTIONAL LAW — RELIGIOUS CORPORATIONS AND ASSOCIATIONS — DISCI-
   PLINARY PRACTICES — GOVERNMENTAL REGULATION.

   A church has authority to prescribe and follow disciplinary ordi-
   nances against its members without fear of interference by the
   state as long as the discipline does not pose a substantial threat to
   public safety, peace or order; the Free Exercise Clause affords a
   shield from interference by secular inquest when the target of civil
   litigation is simply a church's implementation of discipline against a
   member; however, a different situation exists where the com-
   plaining party was never a member of the church or withdrew
   membership or was excommunicated before the offending act of
   church discipline occurred; once a person withdraws from mem-
   bership and withdraws consent to obey church disciplinary poli-
   cies, the church loses its power to actively monitor the person's
   spiritual life or impose overt disciplinary actions on the person (US
   Const, Am I).

*William S. Stern, P.C.* (by *William S. Stern*), for
the plaintiff.

*Bigler, Berry, Johnston, Sztykiel & Hunt, P.C.* (by
*Witold Sztykiel*), for the defendants.

Before: JANSEN, P.J., and MARKEY and O'CONNELL, JJ.

MARKEY, J. Plaintiff appeals by right the trial court's
summary disposition order entered pursuant to MCR
2.116(C)(4), (8), and (10) in favor of defendants. We
affirm in part, reverse in part, and remand.

This case involves plaintiff's confessions in the mid-
1980s to defendant Mark Byers, pastor of defendant

Calvary Christian Church,[1] that he had previously
engaged in marital infidelity with prostitutes and the
pastor's decision, in late 1996, to convey this informa-
tion to the entire congregation, including plaintiff's
wife, family, and friends. Apparently, despite plain-
tiff's belief that his confession to defendant pastor
was confidential, defendant Byers stated that he did
not believe in confidential communications and that
church doctrine required exposing plaintiff's sins to
the congregation. Plaintiff claims that defendant
Byers was not motivated by religious doctrine but by
ill will and the intent to humiliate plaintiff and to cre-
ate dissension within his family.

Plaintiff filed his complaint against defendants
alleging that they breached their explicit and implicit
duty of confidentiality to him by disclosing personal,
sensitive information to the church congregation.
Plaintiff also alleged that MCL 600.2156;    MSA
27A.2156 created a cause of action against defendant
Byers based on this disclosure. Moreover, plaintiff
complained that this intentional breach of confidenti-
ality caused him to suffer extreme psychological dis-
tress requiring treatment, as well as physical and
mental pain. On appeal, plaintiff appears to challenge
the trial court's grant of summary disposition only in
regard to his allegations of intentional torts.

The trial court issued a written opinion granting
defendants' motions for summary disposition, deter-
mining that MCL 600.2156;  MSA 27A.2156 was a rule
of evidence that did not create a cause of action for
disclosure of private or privileged communications.

---

[1] Defendant Calvary Christian Church is also referred to as "Calvary
Temple Church" in the church's constitution and bylaws attached to
defendants' brief on appeal.

Thus, plaintiff failed to state a claim upon which relief could be granted. MCR 2.116(C)(8). The court also agreed that plaintiff and defendants did not enter into an express agreement regarding the confidentiality of the confessions plaintiff made to defendant Pastor Byers. Thus, plaintiff could not prove the necessary elements of a breach of contract action. Therefore summary disposition was granted to defendants under MCR 2.116(C)(10). Moreover, the court also concluded that whether the church required that the clergy keep confidential a member's personal disclosures was a matter of religious doctrine that the court could not determine according to civil law principles; consequently, even if properly pleaded, plaintiff could not and had not set forth prima facie causes of action for any form of intentional tort either.

I

Plaintiff asks this Court to determine whether the Free Exercise Clause of the United States Constitution's First Amendment prevents him from asserting a claim of intentional infliction of emotional distress and invasion of privacy where defendant Byers disclosed to the congregation personal information about plaintiff that plaintiff confidentially revealed to defendant Byers. Assuming that plaintiff is a member of defendant church, and because this question requires judicial review and interpretation of defendant church's doctrine, we answer in the affirmative.

Our review of constitutional issues and motions for summary disposition under MCR 2.116(C)(8) and (10) is de novo. See *Wilkins v Gagliardi*, 219 Mich App 260, 266; 556 NW2d 171 (1996); *Pinckney Community Schools v Continental Casualty Co*, 213 Mich App

521, 525; 540 NW2d 748 (1995). Under both MCR 2.116(C)(4) and (10), summary disposition is properly granted where the court determines that the defendant is entitled to judgment as a matter of law or the pleadings, affidavits, or other proofs do not establish a genuine issue of material fact. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994); *Walker v Johnson & Johnson Vision Products Co*, 217 Mich App 705, 708; 552 NW2d 679 (1996). Under MCR 2.116(C)(8), we look to the pleadings alone, accept as true all factual allegations and reasonable inferences in support of the claim, and determine whether the plaintiff has failed to state a claim upon which relief can be granted. *Simko v Blake*, 448 Mich 648, 654; 532 NW2d 842 (1995).

The First Amendment of the United States Constitution provides, in part, that Congress shall make no law prohibiting the free exercise of religion. US Const, Am I. This prohibition applies to the states through the Fourteenth Amendment, US Const, Am XIV. *Cantwell v Connecticut*, 310 US 296, 303; 60 S Ct 900; 84 L Ed 1213 (1940). The Free Exercise Clause prohibits government regulation of religious beliefs. *Wisconsin v Yoder*, 406 US 205, 219-220; 92 S Ct 1526; 32 L Ed 2d 15 (1972). Government regulation may, however, lawfully impose an incidental burden on otherwise protected conduct where necessary to protect important societal interests, i.e., where a state interest of significant magnitude exists to override the interest allegedly protected under the Free Exercise Clause. *Assemany v Archdiocese of Detroit*, 173 Mich App 752, 759-760; 434 NW2d 233 (1988); *McLeod v Providence Christian School*, 160 Mich App 333, 343; 408 NW2d 146 (1987).

It is well established that only conduct posing a substantial threat to public safety, peace, or order may be subject to governmental regulation, even if that conduct is prompted by religious beliefs or principles. *Sherbert v Verner*, 374 US 398, 402-403; 83 S Ct 1790; 10 L Ed 2d 965 (1963). Conduct prompted by religious beliefs or principles is not, therefore, absolutely immunized from government intervention because actions taken for a presumably religious purpose can nonetheless negatively affect the public interest in peace, safety, and order. *Id.* "Thus, individuals have a qualified privilege to engage in conduct for religious purposes." *Korean Presbyterian Church of Seattle Normalization Committee v Lee*, 75 Wash App 833, 839; 880 P2d 565 (1994).

Absent conduct that negatively affects the public interest in peace, safety, and order, both federal and state courts are severely restricted by the First and Fourteenth Amendments of the United States Constitution, and art 1, § 4 of the Michigan Constitution of 1963, in resolving disputes between a church and its members. *Maciejewski v Breitenbeck*, 162 Mich App 410, 413-414; 413 NW2d 65 (1987). Indeed, jurisdiction over these matters is limited to determining property rights that can be resolved by the application of civil law. *Id.* at 414; see also *Davis v Scher*, 356 Mich 291, 297; 97 NW2d 137 (1959). When the court faces issues requiring the application of religious doctrine or ecclesiastical polity,[2] the court ceases to have jurisdiction. *Davis, supra; Berry v Bruce*, 317 Mich 490, 500-501; 27 NW2d 67 (1947).

---

[2] "Polity" refers to a church's organization and form of government. *Maciejewski, supra* at 414.

The United States Supreme Court has defined religious doctrine as ritual, liturgy of worship, and tenets of faith. *Jones v Wolf*, 443 US 595, 602; 99 S Ct 3020; 61 L Ed 2d 775 (1979); see also *Bennison v Sharp*, 121 Mich App 705, 713; 329 NW2d 466 (1982).

In *Maciejewski, supra* at 414, this Court affirmed the trial court's grant of summary disposition in favor of the defendants regarding the plaintiffs' claim of intentional infliction of emotional distress based on alleged misconduct by church leaders. We found that

> [i]t is beyond the jurisdiction of civil courts to determine rights to communion, qualification of members and privileges of membership which are necessary to decide the issues in this case. The trial court is not equipped or empowered to make such inquiries and was obliged therefore to grant summary disposition. [*Id.* at 416.]

Here, the manner in which defendant church and defendant Byers decide to discipline the church's *members* and the religious doctrine that underlies the discipline are matters of ecclesiastical polity. In his affidavit, defendant Byers stated that plaintiff's discipline was consistent with article III, § 3 of defendant church's bylaws, entitled "Discipline," which states that members wilfully absent from services for an extended period or who are "under charges" are temporarily suspended from active voting membership pending investigation of the case. The section also states that "[u]nscriptural conduct or doctrinal departure from the tenets of faith held by this assembly shall be considered sufficient grounds upon which any person may be disqualified as a member," citing several biblical passages underlying these bylaws, including Matthew 18:15-18; this biblical passage spe-

cifically states that the congregation should be told of the member's sins if the sinner refuses to repent.

Despite the civil tort language that plaintiff applies to defendants' actions, we cannot say that the facts in this case either permit or require judicial intervention into defendants' decision to discipline the church's members because this exercise will necessarily involve interpreting religious doctrine. Accord *Serbian Eastern Orthodox Diocese for the United States of America & Canada v Milivojevich*, 426 US 696, 709- 710; 96 S Ct 2372; 49 L Ed 2d 151 (1976). Even the cases from foreign jurisdictions that plaintiff cites do not consistently mandate judicial interference where a minister takes action that adversely affects and often publicly embarrasses members of the congregation.[3]

---

[3] For example, plaintiff cites *Guinn v Church of Christ of Collinsville*, 775 P2d 766 (Okla, 1989), where the plaintiff sued her church and its leader for intentional infliction of emotional distress and invasion of privacy when her pastor carried out the church's disciplinary measures in accordance with biblical passages and exposed her sexual misconduct to the entire congregation. Although the plaintiff was awarded damages at trial, the Oklahoma Supreme Court reversed the award and remanded for dismissal of the plaintiff's claims, *id.* at 773-774. In so finding, the court stated that

"whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." If members of religious organizations could freely pursue their doctrinal grievances in civil courts, or legislatures could pass laws to inhibit or enhance religious activities, ecclesiastical liberty would be subjected to governmental interference and the "unmolested and unobstructed" development of opinion and belief which the First Amendment shield was designed to foster could be secularly undermined. [*Id.* at 771-772 (citation omitted).]

Thus, even though the dispute was not immune from judicial scrutiny because it concerned the tortious nature of religiously motivated acts and

Moreover, we do not believe that defendant Byers' announcement constituted a threat to public safety, peace, or order justifying state interference. Cf. *Guinn v Church of Christ of Collinsville*, 775 P2d 766, 773-775 & n 35 (Okla, 1989) (human sacrifices as part of religious worship would justify state interference); *Hester v Barnett*, 723 SW2d 544, 558 (Mo App, 1987) (pastor's defamation of nonmembers would "fester into a substantial threat 'to public safety, peace or order,'" if legal recourse were denied to the offended party). "Disciplinary practices involving members of an ecclesiastical association, which do not pose a substantial threat to public safety, peace or order, are unquestionably among those hallowed First Amendment rights with which the government cannot interfere." *Guinn, supra* at 779. Absent evidence that defendants' actions satisfied this standard, we believe that judicial interference in this case is unjustified.

II

Plaintiff argues, however, that the Free Exercise Clause permits a tort cause of action to exist because plaintiff left the church congregation *before* defendant Byers' disclosure of the confidential information to the congregation. According to plaintiff's affidavit, he was *not* a church member on the date in question. He

---

not the orthodoxy established by church doctrine, the court found that the defendants' disciplinary action against the plaintiff did not constitute a threat to public safety, peace, or order justifying state interference. *Id.* at 773-774. Because the defendants had the right to rely on the plaintiff's consensual participation in the congregation when they disciplined her as one who had voluntarily elected to adhere to their doctrinal precepts, the court found that under the Free Exercise Clause, the defendants' religiously motivated discipline was free from secular judicial scrutiny. *Id.*

alleges that once he resigned his membership, defendants cannot claim that the disclosure constituted church-imposed discipline against him. While the case law from other jurisdictions supports plaintiff's arguments, we find conflicting evidence in the record regarding whether plaintiff was a member of defendant church on that fateful day.

Because we find no case law on point in Michigan, we look to decisions from other state courts for instruction. Foreign jurisdictions addressing the question whether a church can discipline individuals without fear of judicial intervention focus on whether the complaining individual was a member at the time of the disciplinary action. Where the plaintiff is a member of the church at the time of the defendant church's alleged tortious activity and that relationship has not been freely severed, "the church has authority to prescribe and follow disciplinary ordinances without fear of interference by the state." *Hadnot v Shaw*, 826 P2d 978, 987 (Okla, 1992); *Guinn, supra* at 773-774; see also *Hester, supra* at 559 (if the plaintiffs were members of the church and congregation, "they presumptively consented to religiously motivated discipline practiced in good faith"). The Oklahoma Supreme Court in *Guinn, supra* at 774, summarized the basis for this decision as follows:

> When people voluntarily join together in pursuit of spiritual fulfillment, the First Amendment requires that the government respect their decision and not impose its own ideas on the religious organization. Under the First Amendment people may freely consent to being spiritually governed by an established set of ecclesiastical tenets defined and carried out by those chosen to interpret and impose them:

"The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association,[4] and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government and are bound to submit to it."

Under the First Amendment's Free Exercise Clause, Parishioner had the right to consent as a participant in the practices and beliefs of the Church of Christ without fear of governmental interference. . . . Under the Free Exercise Clause the Elders had the right to rely on Parishioner's consensual participation in the congregation when they disciplined her as one who had voluntarily elected to adhere to their doctrinal precepts. Parishioner's willing submission to the Church of Christ's dogma, and the Elders' reliance on that submission, collectively shielded the church's *prewithdrawal*, religiously-motivated discipline from scrutiny through secular judicature. [Emphasis added; citation omitted.]

Similarly, where the plaintiff did not withdraw the plaintiff's church membership during the disputed conduct or activity, "the Church retained full subject matter and personal jurisdiction to adjudicate the . . . disciplinary cases against the parishioner[]. . . . [P]arishioners must positively act to withdraw membership if they intend church jurisdiction to cease. When the target of civil litigation is simply the

---

4 As an aside, we note that unlike a hierarchical church, defendant church appears to be a congregational church that is a self-governing body; thus, no religious authority exists beyond the particular congregation to which a disgruntled member can appeal. *Guinn, supra* at 771, n 18; *First Baptist Church of Glen Este v Ohio*, 591 F Supp 676, 681 (SD Ohio, 1983). "The Supreme Court has not . . . addressed the permissible scope of review of church disciplinary matters in a congregational church." *Id.*

church's implementation of its valid ecclesiastical judicature, the Free Exercise Clause of the First Amendment will afford a shield from interference by secular inquest." *Hadnot, supra* at 987-988.

Where, however, the complaining party was never a member of the offending pastor's church, or he withdrew membership or was excommunicated before the offending act of church discipline occurred, a different situation exists. The church or its representatives might no longer permissibly impose their religious views and doctrine on the nonmember. These distinctions are explained in *Hadnot, supra* 989-990, as follows:

> In the event of withdrawal or of post-excommunication activity unrelated to the church's efforts at effectuation of valid judicature, the absolute privilege from tort liability no longer attaches. Any action at this point, if it is to be protected, must be justified by others means. Under these circumstances conditional privileges may be applicable. The church may take such steps as are reasonable to protect itself and to complete the process occasioned by the withdrawal or other termination of the consensual relationship with a member.

See also *Guinn, supra* at 775-782; *Hester, supra* at 559-560; cf. *Hadnot, supra* at 987-988.

In *Guinn, supra* at 768, the plaintiff parishioner withdrew her membership from the church and informed the church's elders that they should not disclose to the congregation, which comprised five percent of her town's population, that she was engaging in fornication with a man from another church. She told the elders that, if the elders made the public disclosure, she would be forced to take legal action. The elders told her it was doctrinally impossible to with-

draw her membership and the attempted withdrawal would not stop their disciplinary sanctions. *Id.* The elders thereafter announced to the congregation that the parishioner was a fornicator. The parishioner sued for intentional infliction of emotion distress and invasion of privacy. A jury awarded her actual and punitive damages of $205,000 and $185,000, respectively. *Id.* at 769.

The Oklahoma Supreme Court found that the elders' disciplinary actions taken before the parishioner's withdrawal from membership was exempt from judicial scrutiny, but it upheld the jury's findings that the elders committed the charged intentional torts *after* the petitioner sent the letter withdrawing her membership. *Id.* at 774-782. The court affirmed that both the freedom to worship *and "the liberty to recede from one's religious allegiance"* are protected under the First Amendment. *Id.* at 776 (emphasis added). "[H]ere, it is the Collinsville Church of Christ that, by denying Parishioner's right to disassociate herself from a particular form of religious belief, is threatening to curtail her freedom of worship according to her choice." *Id.* at 777. Thus, unless she waived her right to withdraw consent to be bound by the church's disciplinary practices, the parishioner's resignation from the church was a constitutionally protected right. *Id.*

> While the First Amendment requires that citizens be tolerant of religious views different from and offensive to their own, it surely does not require that those like Parishioner, who choose not to submit to the authority of any religious association, be tolerant of that group's attempts to govern them. Only those "who unite themselves" in a religious association impliedly consent to its authority over them and are "bound to submit to it." Parishioner voluntarily joined

the Church of Christ and by so doing consented to submit to its tenets. *When she later removed herself from membership, Parishioner withdrew her consent, depriving the Church of the power actively to monitor her spiritual life through overt disciplinary acts. No real freedom to choose religion would exist in this land if under the shield of the First Amendment religious institutions could impose their will on the unwilling and claim immunity from secular judicature for their tortious acts.* [*Id.* at 779 (emphasis added).]

The *Guinn* court recognized that the parishioner's case involved a congregation's concern with the sins of a former member who had no interest in continuing her association with the church and "posed no threat of continued adverse influence" on any church member. *Id.* at 782. Here, plaintiff's alleged protests against defendant Byers may constitute a threat of adverse influence on defendant church members, but we are unable to make that decision in this appeal from the order of summary disposition regarding this issue.

The result in *Guinn* was also reached in *Hester, supra* at 550, 555-560, 563-564, where the plaintiffs were not members of the defendant pastor's church, but the defendant pastor defamed them in front of his congregation and reported them to child protective services after the plaintiffs told the defendant pastor that their children had behavioral problems. Because the plaintiffs were not members and their pleadings supported several tort causes of action against the defendants, the Missouri Court of Appeals reversed the dismissals of the plaintiffs' claims for alienation of affections, defamation, invasion of privacy, and tortious interference of contract. *Id.* at 564.

With respect to the plaintiffs' defamation count, the *Hester* court reasoned that the plaintiffs would have no tort claim if the plaintiffs were members of the defendant's congregation and the statements the defendant pastor made from the pulpit were not only a form of chastening usual for wayward members but also conformable to the church's liturgy, discipline, and ecclesiastical policy. *Id.* at 559-560. "[Members] presumptively consented to religiously motivated discipline practiced in good faith." *Id.* at 559. Because the plaintiffs were never members of the defendant pastor's church, however, "[i]t is competent, therefore, for a court to inquire whether the sermon declarations that the Hesters stole, committed arson and abused their children were expressions of actual creed and practice, held and exercised in good faith, *or were merely the religious occasion for the wholly secular purpose of intentional defamation and injury to reputation of persons not even communicants of the church.*" *Id.* (emphasis added). In the case at bar, we believe that a genuine issue of material fact exists regarding whether plaintiff was a member of defendant church in December 1996. In a June 1997 affidavit attached to his brief opposing summary disposition, plaintiff stated that "[a]t the time that Pastor Mark Byers made the disclosure to the congregation, December 8, 1996, I was no longer a member of the church. However, my wife and members of my family were still church members at the time of the disclosure." We find no allegations in plaintiff's complaint, however, regarding whether plaintiff had renounced his membership in defendant church by December 8, 1996.

Defendants' brief on appeal merely states that although plaintiff had been excommunicated from the church a few years earlier, he had rejoined defendant church after repenting but was a dissenting member of that body in December 1996. The lower court record contains plaintiff's original membership application to defendant church and a copy of defendant church's constitution and bylaws[5] that discuss membership requirements. Without more, however, we are unable to determine whether plaintiff was a member of defendant church on December 8, 1996, and, therefore, whether defendants' disciplinary actions against him are protected from judicial scrutiny. *Guinn, supra; Hester, supra* at 559-560.

First, if plaintiff was a member of defendant church on December 8, 1996, then judicial examination of defendant Byers' discipline against plaintiff is precluded by the Free Exercise Clause of the First Amendment. Summary disposition in favor of defendants would therefore be affirmed.

If, however, plaintiff was not a member of defendant church in December 1996, then a closer look at plaintiff's intentional tort claims is justified because once he removed himself from membership and with-

---

[5] Defendant church's constitution, article VI, § 4 is entitled "Inactive Membership," and states that individuals "out of harmony with its teachings to its ministries, or who shall be under charges for misconduct, or who have fallen under condemnation through sinful or worldly practices, shall be considered as inactive members and shall lose their voting privileges . . . ." If a member is inactive for one year, that member is "automatically removed from the membership roll altogether." Reinstatement requires that the person reapply for membership and be approved by the church board. Defendant church's bylaws, article III, § 5 also states that defendant pastor and the board of elders shall revise the membership roll annually to remove "the names of those who may have withdrawn from the fellowship, or who may have fallen into sin and whose lives may have become inconsistent with the standards and teachings of the assembly."

drew his consent to obey church disciplinary policies, defendants lost their power to actively monitor plaintiff's spiritual life or impose overt disciplinary actions on plaintiff. *Guinn, supra* at 779. Because the trial court dismissed plaintiff's intentional tort claims without reviewing their substance, we will determine whether plaintiff has stated a claim for recovery upon which relief can be granted or whether plaintiff is entitled to judgment as a matter of law. MCR 2.116(C)(8).

Unlike the negligence torts, which require a legal duty as part of the prima facie case, the intentional torts alleged in plaintiff's complaint do not require a specific legal duty. To establish a prima facie case of intentional infliction of emotional distress, the plaintiff must show four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Haverbush v Powelson*, 217 Mich App 228, 234; 551 NW2d 206 (1996). "Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* Common-law invasion of privacy protects against four types of invasion: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs, (2) public disclosure of embarrassing private facts, (3) publicity that places the plaintiff in a false light, and (4) appropriation of the plaintiff's name or likeness. *Doe v Mills*, 212 Mich App 73, 80; 536 NW2d 824 (1995). Although not specifically pleaded, plaintiff's complaint alleges a cause of action for public disclosure of embarrassing pri-

vate facts, which requires (1) the disclosure of information (2) that is highly offensive to a reasonable person[6] and (3) that is of no legitimate concern to the public. *Id.* The jury must determine whether a public disclosure involves embarrassing private facts. *Id.* at 81.

Plaintiff's complaint, although minimal in its allegations and compliance with MCR 2.113(E)(3), states a claim for both intentional infliction of emotional distress and invasion of privacy. Construing the factual allegations in plaintiff's complaint as true and taking all reasonable inferences from those allegations in plaintiff's favor, we believe that plaintiff has pleaded that defendant Byers disclosed to the congregation plaintiff's previous contacts with prostitutes and that this information was of no legitimate concern to the public and was conveyed to the congregation with the intent to embarrass plaintiff and cause him severe emotional distress. Whether defendant Byers' conduct was sufficiently outrageous or extreme is a question best left to the jury. Also, whether plaintiff's previous disclosure of these facts to his wife affects his ability to recover under either intentional tort is not a question for this Court. We believe, however, that if the trial court determines that plaintiff was not a member of defendant church on December 8, 1996, then plain-

---

[6] The Restatement of Torts describes the publicity that gives rise to an action for public disclosure of embarrassing private facts:

> The rule stated in this Section gives protection only against unreasonable publicity, of a kind highly offensive to the ordinary reasonable man. . . . It is only when the publicity given to him is such that a reasonable person would feel justified in feeling seriously aggrieved by it, that the cause of action arises. [3 Restatement Torts, 2d, § 652D, comment c, p 387.]

tiff's intentional tort claims should survive defendants' motion for summary disposition.[7]

We therefore affirm the grant of summary disposition with respect to the breach of contract and statutory claims, reverse the grant of summary disposition in favor of defendants with respect to claims for intentional torts, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

JANSEN, P.J., concurred.

O'CONNELL, J. (*dissenting*). I respectfully dissent. Although I agree with the majority's conclusion that the Free Exercise Clause of the First Amendment shields churches and their ministers from judicial review of any disciplinary practices involving members that do not pose a substantial threat to public safety, peace, or order, I depart from the majority in that I do not believe that any part of present plaintiff's case hinges on whether plaintiff was a member of defendant church at the time of the disciplinary action in question. Because there is no dispute that the dissension between plaintiff and defendants arose from events that occurred while plaintiff was a member of the church, whether plaintiff was still a member at the time of defendants' resulting disciplinary action, or had just resigned, or was in the process of being excommunicated, or was being "marked" (as

---

[7] Not before us now but what may become an issue for another day, is whether defendants' actions might enjoy a conditional privilege as a reasonable step to protect themselves and "complete the process occasioned by the withdrawal or other termination of the consensual relationship with a member." *Hadnot, supra* at 989.

Pastor Byers maintains) has no bearing on the resolution of this case.

The principle that a court must be vigilant in respecting the limits of its jurisdiction, see *Straus v Governor*, 230 Mich App 222, 227; 583 NW2d 520 (1998), lv gtd 458 Mich 865 (1998), applies especially where the controversy at hand implicates the Free Exercise Clause. All parties to this litigation and the majority concede that the central issue in this case is a dispute involving matters of religious doctrine, practice, and polity.[1] Where the central issue involves a matter of religious doctrine or church discipline, civil courts may not assume jurisdiction over the controversy.[2]

> " 'The civil courts will not enter into a consideration of church doctrine or church discipline, nor will they inquire into the regularity of the proceedings of the church judicatories having cognizance of such matters. To assume such jurisdiction would not only be an attempt by the civil courts to deal with matters of which they have no special knowledge, but it would be inconsistent with complete religious liberty untrammeled by State authority.' " [*Berry v Bruce*, 317 Mich 490, 501; 27 NW2d 67 (1947), quoting *Borgman v Bultema*, 213 Mich 684, 703; 182 NW 91 (1921), quoting

---

[1] At issue is whether the church's doctrine requires that its pastor keep confidential a member's personal disclosures (a confession), or whether the pastor was within his rights under church law when he used information from plaintiff's confession to announce to the congregation, including members of plaintiff's immediate family, that the membership should totally disregard plaintiff because he was of low moral character.

[2] I also have some concern that once the majority renders its decision concerning church policy, and the trial court passes further on this on remand, defendant church may believe it is under court orders to adopt the judicial interpretations of its doctrine. Although I have little doubt that some religious dogma would benefit from interpretation according to modern conventions of civil jurisprudence, I have no doubt that this is precisely what our forefathers intended to avoid when drafting and ratifying the Free Exercise Clause of the First Amendment.

*Morris Street Baptist Church v Dart*, 67 SC 338, 342; 45 SE 753 (1903).][3]

The First Amendment provides ecclesiastical organizations with a shield covering all disciplinary practices involving their members that do not pose a substantial threat to public safety, peace, or order. *Guinn v Church of Christ of Collinsville*, 775 P2d 766, 779 (Okla, 1989). If church doctrine authorizes a sanction, the constitutional shield should remain in place even if the subject of the discipline has ceased to be a member, if the actions relate to church doctrine.[4] Any other rule would involve the state in determining what is or is not a legitimate ecclesiastical disciplinary measure.[5]

In the present case, the parties and the majority agree that the dispute involves a matter of religious doctrine that arose while plaintiff was a member of the church. Because the dispute involves church doctrine, the disciplinary measure at issue is protected under the Free Exercise Clause of the First Amend-

---

[3] Although *Berry* and *Borgman* are admittedly old Supreme Court cases, they are still good law, and, unlike the sister-state cases on which the majority relies, binding on this Court.

[4] If plaintiff was in fact no longer a member of the church at the time of defendants' disciplinary measures, defendants' postwithdrawal actions nonetheless remain conditionally privileged. See 3 Restatement Torts, 2d, §§ 593-594, pp 261-265.

[5] Unfortunately, the majority diminishes the protections (shield) of the First Amendment by first drawing an artificial line (membership versus nonmembership), and then by concluding that the courts have the authority to review church policy and construe its doctrine as applied to the church's expatriates. I am of the opinion that the elucidation of religious tenets is best left to theologians. Further, while the majority cites two foreign-state cases in support of their current-member/former-member distinction regarding a church's First Amendment right to impose ecclesiastical sanctions, I defer instead to binding precedent from this state's Supreme Court. See n 3, *supra*.

ment, even if it was imposed after plaintiff severed his membership in the church. While the majority cites *Hadnot v Shaw*, 826 P2d 978, 989 (Okla, 1992), for the proposition that a church loses its absolute privilege from tort liability concerning disciplinary actions after withdrawal or excommunication of the disciplined person, I note that *Hadnot* also states that termination of that absolute privilege requires some "affirmative act" severing the affiliation of the subject of the discipline from the church. *Id.* Although in the present case plaintiff's precise status with defendants at the time of their disciplinary action against him is not clear, the record nowhere suggests that either plaintiff or defendants had affirmatively severed their religious ties. Further, *Hadnot* recognizes that a church retains the right to complete whatever processes against a former member that were in progress during that person's period of membership.[6] *Id.* at 987.

This Court, in *Maciejewski v Breitenbeck*, 162 Mich App 410; 413 NW2d 65 (1987), stated as follows:

> It is well settled that courts, both federal and state, are severely circumscribed by the First and Fourteenth Amendments to the United States Constitution and art 1, § 4 of the Michigan Constitution of 1963 in resolution of disputes between a church and its members. Such jurisdiction is limited to property rights which can be resolved by application of civil law. Whenever the court must stray into questions

---

[6] I would liken this to a state's continuing personal jurisdiction over a former citizen concerning matters arising while that person resided within the state. Just as one cannot evade a state's jurisdiction over such matters simply by the expedient of taking up residence in another state, a parishioner should not be able to constrain continuing church practices stemming from and immediately following the parishioner's affiliation simply by severing ties with the church.

of religious doctrine or ecclesiastical polity the court loses jurisdiction. [*Id.* at 413-414, citing *Berry, supra; First Protestant Reformed Church v DeWolf*, 344 Mich 624; 75 NW2d 19 (1956); *Berkaw v Mayflower Congregational Church*, 378 Mich 239; 144 NW2d 444 (1966); *Bennison v Sharp*, 121 Mich App 705; 329 NW2d 466 (1982); *Beulah Missionary Baptist Church v Spann*, 132 Mich App 118, 125; 346 NW2d 911 (1984) (H.R. GAGE, J., concurring)].

For these reasons, I conclude that this Court has no jurisdiction to resolve this dispute.[7] Accordingly, I would affirm the decision of the trial court in its entirety.

---

[7] In his brief on appeal, plaintiff states that he engaged the country's foremost expert in the interpretation of church doctrine, who is prepared to testify that it violates church doctrine for officials to reveal a member's personal disclosures to the congregation. This expert may be correct, but I believe that the Free Exercise Clause of the First Amendment prohibits state courts from rendering judgments on such matters. While I mean no disrespect to plaintiff's expert, theologians have been debating religious doctrine throughout the thousands of years of human history. It would be unfortunate to see this debate come to an end in any particular as a result of a state court's judicial decision. Further, I think it neither wise nor proper for a state court to determine which among conflicting theologians has the superior knowledge concerning a religious controversy.